Daniel T. O'KEEFE, Plaintiff,

v.

NIAGARA MOHAWK POWER CORP., Individually and in their capacity as constituent members of the New York Power Pool, Defendants.

No. 86–CV–1354.

United States District Court, N.D. New York.

June 8, 1989.

DeGraff Foy Conway Holt–Harris & Mealey, Albany, N.Y., for plaintiff; Carroll J. Mealey, of counsel.

Bond Schoeneck & King, Albany, N.Y., for defendants; Richard C. Heffern, Nicholas J. D'Ambrosio, Jr., Julie M. Rogge, of counsel.

## MEMORANDUM–DECISION AND ORDER

McCURN, Chief Judge.

On June 7, 1988, this court heard oral argument on defendants' motion for summary judgment. Following oral argument, the court granted that motion with respect to plaintiff's second and fourth causes of action and reserved decision with respect to the first and third causes of action. The court further indicated that it would be issuing a memorandum-decision and order setting forth the reasons for its rulings, and following constitutes the court's decision in this regard.

## BACKGROUND

This action arises out of plaintiff's termination from his job. In June, 1978, plaintiff began working as a "teacher-demonstrator" for the New York Power Pool ("Power Pool").[1] As a teacher-demonstrator, one of plaintiff's primary responsibilities was to present an energy conservation program, entitled Energy Today and Tomorrow ("ET & T") to various audiences across New York State. The ET & T program was sponsored by Oak Ridge Associated Universities ("Oak Ridge"). According to its 1984 Annual Report, Oak Ridge is a private, not-for-profit association, comprised of approximately 50 colleges and universities, which conduct research and educational programs regarding energy, health and the environment. Those programs are conducted for the United States Department of Energy and other organizations. Oak Ridge receives "almost two-thirds" of its operating funds from the Department of Energy; and a quarter of its funds from "other federal sources." Plaintiff's Exhibit 3 at p. 2. Oak Ridge's Energy Education Division ("EED") creates and oversees educational programs, such as the ET & T program. Although the EED was historically supported by private funding sources, in fiscal year 1984 "some 10 percent of the division's total funding was supplied by the public sector" through the Institutional Conservation Programs Branch of the U.S. Department of Energy. *Id.* at p. 23.

In the letter offering plaintiff the position as a teacher-demonstrator, he was advised that there was a possibility that the ET & T program could be cancelled in the future if the Power Pool's Executive Committee decided not to renew it. Defendants' Ex. D. Although the letter set forth plaintiff's beginning annual salary, no other express terms of his employment were mentioned, such as the duration of his employment; nor was the Power Pool's right of termination mentioned. Finally, there was no indication therein that in the event plaintiff was terminated from his position as a teacher-demonstrator that he could return to work for NiMo, where he had been employed in various capacities from 1974–1978. The letter did state, though, that "You will remain on the payroll of Niagara Mohawk Power Corporation but will be permanently assigned to the Pool Staff." *Id.* According to plaintiff, however, when he was interviewed for the position by Bryan Gosling, Power Pool's Public Relations Manager, Gosling told plaintiff that if he was terminated or decided to leave the Power Pool, he would be placed back at NiMo. O'Keefe Affidavit (5/12/88) at par. 5.

Plaintiff began his job as a teacher-demonstrator by attending a training course at Oak Ridge, Tennessee, in the summer of 1978. From 1978–1982, plaintiff was on the road the majority of the time presenting the ET & T program. During those years, plaintiff also attended additional training sessions at Oak Ridge and took the van for servicing. He traveled in a van specially equipped with the necessary audio-visual equipment, which the Power Pool leased from Oak Ridge. In addition to leasing the van and equipment from Oak Ridge, the Power Pool paid Oak Ridge for teacher-demonstrator training. The Power Pool did not receive any financial assistance from Oak Ridge, though, for the ET & T program.

The Power Pool hired a second teacher-demonstrator and contracted with Oak Ridge for two additional ET & T units in 1980. Additionally, in November, 1982, pursuant to direction of the Power Pool's Public Relations Committee, Mr. Gosling increased staff resources for another education project. Plaintiff then began assuming some of the duties of a communications specialist, to allow the designated communications specialist to concentrate on the

---

**1.** The Power Pool is an unincorporated association consisting of seven New York electrical companies and the New York State Power Authority. Among other things, the Power Pool provides public relations services for its member companies. Defendant Niagara Mohawk ("NiMo") is a member of the Power Pool. Originally the six other members of the Power Pool were also named as defendants in this action, but they were voluntarily dismissed in October, 1987.

new project. Unlike a teacher-demonstrator, a communications specialist is primarily placed at the Power Pool's control center, conducting tours and coordinating and providing public relations activities. Because plaintiff was acting as a communications specialist, by January, 1983 he was only on the road on a part time basis. Even though plaintiff was technically listed as a teacher-demonstrator, on his 1983 and 1984 job evaluations, it was noted that he was "performing duties of communications specialist on a temporary basis." Plaintiff's Ex. 5. In addition, plaintiff received business cards from the Power Pool identifying him as a communications-specialist. Plaintiff's Ex. 6.

Although plaintiff was acting as a communications-specialist by January, 1983, he still had responsibilities under the ET & T program, which required him to be on the road part-time. Gosling Affidavit (2/26/88) at par. 15. In addition, despite acting as a communications-specialist, plaintiff was to remain available to present the ET & T program on an "as requested basis." *Id.* In fact that ET & T responsibility was expressly included in the job description of a communications-specialist. *Id.* at par. 10. Further, the Power Pool agreed to make plaintiff available 50% of his time for the purpose of presenting the ET & T program. *Id.* at par. 15. During the 1984–85 academic year, 25% of plaintiff's time was committed to being available to present the ET & T program. *Id.* at par. 16. To put the number of days plaintiffs spent on the road in perspective, defendants calculated those hours based upon plaintiff's expense vouchers, which reflect actual travel time. From January 18, through December 31, 1983, plaintiff spent 69 of 220 work days on the road; or 31% of his work days. *Id.* at par. 17. In 1984, plaintiff spent 92 of 234 days on the road; or 39% of his work days. *Id.*

Plaintiff was convicted for driving while ability impaired in March, 1983; but because the court permitted him to drive for work-related purposes, he continued to be able to go on the road to present the ET & T program. Although Mr. Gosling was aware of that conviction, and in fact he allowed plaintiff to leave work early to attend an alcoholic rehabilitation program required by the court, Mr. Gosling did not report plaintiff's conviction to the Power Pool's Executive Director, William Balet. Gosling Affidavit at par. 19. *See also* O'Keefe Affidavit at par. 11.

Then, in February of 1985 plaintiff informed Mr. Gosling that he had been arrested for driving while intoxicated ("DWI"). In accordance with plaintiff's request, Mr. Gosling did not report the arrest to Mr. Balet until the disposition was known. On March 20, 1985, plaintiff told Mr. Gosling that he had been convicted of DWI and that his license had been revoked for six months. O'Keefe Affidavit at par. 12. Mr. Gosling in turn reported this development to Mr. Balet. Although Mr. Balet noted that plaintiff could not fulfill his ET & T responsibilities without a driver's license, he informed plaintiff that he could keep working at Power Pool until Mr. Balet contacted the Manger of Employee Relations–East for NiMo. The Manger was not able to find a suitable position for plaintiff in the entire NiMo system. The Manager and Mr. Balet then agreed that plaintiff would have to be terminated. At a meeting on April 11, 1985, the situation was explained to plaintiff. He responded by suggesting that a substitute driver be hired, but the Power Pool rejected that suggestion because of insurance coverage problems.

Neither Mr. Balet nor the NiMo Public Relations Manager were aware that plaintiff had an alcohol problem until *after* the April 11, 1985, meeting where plaintiff's termination was discussed. Mr. Balet did not know of plaintiff's problem until April 12, 1985 when Mr. Gosling told him that plaintiff's brother had called him the previous night advising him that plaintiff was an alcoholic. The NiMo Public Relations Manger learned of plaintiff's problem when plaintiff enrolled in an alcoholic treatment program through NiMo, *after* the April 11, 1985, meeting. Plaintiff remained on NiMo's payroll until June 22, 1985, so that his pension benefits would vest.

In late 1984, due to the decreased public interest in energy conversation, the increased costs of the ET & T units, and Power Pool's budgetary difficulties, Mr. Balet decided the cost of hiring and training a new teacher-demonstrator was no longer justified; and thus he recommended elimination of that position. On May 1, 1985, acting upon Mr. Balet and the Education Subcommittee's recommendations, the Public Relations Committee officially eliminated the teacher-demonstrator position. Plaintiff's duties were then either reassigned or eliminated.

Plaintiff is asserting four causes of action based upon the foregoing events. In plaintiff's first cause of action he alleges that defendants violated the New York Human Rights Law by terminating him because of his claimed disability—alcoholism. Plaintiff's second cause of action alleges that he was terminated in violation of § 504 of the Rehabilitation Act, 29 U.S.C. § 794. Plaintiff's third cause of action alleges that by dismissing plaintiff, defendants breached an oral agreement. Plaintiff's fourth and final cause of action is a tort claim for wrongful discharge wherein plaintiff alleges defendants terminated him for an improper purpose. Plaintiff further alleges that there was no social or economic justification for his termination; and that defendants were maliciously motivated. As previously mentioned, defendants moved for summary judgment dismissing all four of those causes of action.

## DISCUSSION

### I. Human Rights Law Claim

Section 296(1) of the Executive Law provides, in relevant part:

It shall be an unlawful discriminatory practice:

(a) For an employer ..., because of the ... disability, ... of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

N.Y.Exec.Law § 296(1)(a) (McKinney 1982) ("Human Rights Law"). Although plaintiff spent much time arguing that alcoholism is a disability within the meaning of the above cited statute, defendants concede that point solely for the purposes of this motion; and thus the court need not be concerned with that issue.

■ The first issue then is whether plaintiff can establish a *prima facie* case under the Human Rights Law. Plaintiff accurately set forth the applicable rules of law with respect to establishing a *prima facie* case of discrimination under the Human Rights Law. First, plaintiff, as the one alleging the discriminatory practice, has the burden of establishing a *prima facie* case. *Belanoff v. Grayson*, 98 A.D. 2d 353, 355–358, 471 N.Y.S.2d 91, 93–94 (1st Dep't 1984). Once plaintiff makes that showing, the burden is then on the defendant to demonstrate that it had "an independent, legitimate reason, and not a pretext" for the adverse action which it took against the plaintiff. *Id.* (citing *Burlington Industries, Inc. v. New York City Human Rights Commission*, 82 A.D.2d 415, 441 N.Y.S.2d 821 (1st Dep't 1981)). *Accord, Kelly v. Town of North Hempstead*, 103 A.D.2d 767, 477 N.Y.S.2d 396 (2nd Dep't 1984) (Because there was nothing obvious about plaintiff's condition which satisfied the requirement that she was not "reasonably able to do what the position requires," plaintiff made out a *prima facie* case; and the burden shifted to defendant to come forward with evidence to justify plaintiff's dismissal.) The defendants have the additional burden of showing that any unusual treatment of the plaintiff was justified. *Id.*, 98 A.D.2d at 355, 471 N.Y.S.2d at 93.

■ As plaintiff stated, to establish liability under the Human Rights Law, he must prove that "his employment termination was because of his disability *and* that, although disabled, his impairment did not preclude him from performing his duties in a reasonable manner." *Doin v. North American Carbide of New York*, 112 A.D.2d 499, 500, 490 N.Y.S.2d 910, 912 (3rd Dep't 1985) (emphasis added). In the present case, plaintiff maintains that he

was terminated because of his disability—alcoholism. On the other hand, defendants contend that plaintiff was terminated from his job because, after the revocation of his driver's license, he could not fulfill the driving requirements of his part-time ET & T assignment. Plaintiff responds that his inability to drive was simply a "pretext for discrimination" based upon his alcoholism. Yet, as defendants rightly noted, plaintiff has not proffered any evidence on this motion to establish that Mr. Balet, who made the decision to terminate plaintiff, did so based upon any factor other than the revocation of plaintiff's driver's license.

■ As defendants persuasively argue, the evidence in the record, which plaintiff has not controverted, establishes several significant facts. First, the decision to terminate plaintiff was made by Mr. Balet. Balet Affidavit at par. 27. Second, and more importantly, Mr. Balet testified that it was not until sometime *after* the April 11*th* meeting at which plaintiff was terminated that he became aware of plaintiff's alcohol problem. Balet Deposition at 57–58, 72. Moreover, according to those who attended the April 11*th* meeting, *including plaintiff,* plaintiff's alleged alcoholism or drinking problem was not even mentioned. O'Keefe Deposition at p. 135 and 148; Balet Affidavit at pars. 30–31; Conway Affidavit at pars. 14–15 and Gosling Affidavit at par. 24. Those facts, which plaintiff does not refute, show that plaintiff's alleged alcoholism was *not* a factor in the decision to terminate him. Thus, because plaintiff has not produced any evidence demonstrating, or tending to demonstrate that he was terminated because of his alleged disability, an essential element of his Human Rights

Law claim, defendants' summary judgment motion is granted insofar as that cause of action is concerned. That conclusion is also mandated by the fact that, at the very least, plaintiff did not come forth with any evidence which is adequate to raise even an inference of discrimination.[2]

■ Finally, as defendants also soundly reasoned, even if Mr. Gosling's knowledge of plaintiff's problems with alcohol was imputed to Mr. Balet, the decision-maker, plaintiff's "termination was so remote in time from the acquisition of the knowledge that the claim of discrimination is actually refuted." Defendants' Reply Memorandum of Law at p. 5. That is so because plaintiff remained in the employment of the Power Pool for three years *after* he first claims he told his supervisor that he had a drinking problem; and during that time plaintiff received extremely favorable job evaluations and a recommendation from his supervisor for a White House Fellowship. Under those circumstances, it seems clear that the Power Pool terminated plaintiff only after his driver's license was revoked and that there was absolutely no discriminatory animus.

Even assuming *arguendo* that plaintiff could meet his burden of establishing a *prima facie* case of discrimination under the Human Rights Law, as discussed herein, summary judgment must nevertheless be granted. As previously mentioned, after plaintiff meets his burden of making out a *prima facie* case, the defendant/employer must rebut that showing by demonstrating that the plaintiff/employee was discharged for a legitimate, non-discriminatory reason. Here defendants have articu-

---

**2.** It should be noted that relying upon the Seventh Circuit's decision in *Matthews v. Allis–Chalmers,* 769 F.2d 1215 (7th Cir.1985), defendants contend that to establish a *prima facie* discrimination case, plaintiff must "produce[e] circumstantial or direct evidence from which a fact finder might reasonably conclude that the employer intended to discriminate in making the employment decision in issue." *Id.* at 1217. Defendants' reliance is misplaced. The Second Circuit does not recognize such an exacting standard. Rather, at least insofar as establishing a *prima facie* case of discrimination under the ADEA, a plaintiff can establish his initial

burden by coming forth with evidence that "the defendant's employment decision creates an inference that it was based on discriminatory considerations." *Reed v. Signode Corp.,* 652 F.Supp. 129, 133 (D.Conn.1986). Although *Reed* involved an ADEA claim, given the remedial nature of both that statute and the Human Rights Law, there is no reason to hold plaintiff to a more stringent level of proof on a claim under the latter. Thus, in the present case plaintiff could meet his burden of establishing a *prima facie* case by coming forth with evidence creating an inference of discrimination by defendants.

lated such a reason; namely that plaintiff's driver's license was revoked and thus he was unable to perform his ET & T assignments, which were part of his duties.

Plaintiff attempts to dispute that reason by asserting that the driving portion of his job was not one of his "principal" duties because he was not required to do it on numerous occasions; and therefore, dismissing plaintiff for the loss of his license was simply a pretext for discrimination. At the very least, plaintiff suggests that there is an issue of fact and thus summary judgment is improper at this juncture.

■ New York courts have found, however, that in Human Rights Law actions, if an employee is unable to perform a certain portion of his job, that inability provides a legitimate, non-discriminatory reason for terminating the employee. For example, in *Miller v. Ravitch*, 130 A.D.2d 579, 515 N.Y. S.2d 518 (2d Dep't 1987), on remand the Appellate Division determined that due to his inability to engage in physical exertion, including excessive stair climbing, the employee could not perform his principal assignment of station inspector. Thus, even though the employee could perform some of the assignments required by his job title, the Court concluded that he was not disabled for purposes of the Human Rights Law. Consequently, the Appellate Division held that his demotion did not violate the Human Rights Law.

■ Several other cases relied upon by defendants are also instructive. In *Schor v. St. Francis Hospital*, 111 A.D.2d 852, 490 N.Y.S.2d 785 (2d Dep't 1985), a case closely analogous to the present one, petitioner was seeking a position as an intravenous nurse at the respondent hospital. Even though IV nurses do not normally engage in heavy lifting as part of their job, it was the hospital's practice to use IV nurses as "fillins" for absent or vacationing staff nurses. Staff nurses had to "be ready and able to confront emergency life threatening situations which routinely require the use of physical strength to assist and lift patients and equipment." *Id.* at 852, 490 N.Y.S.2d at 786. Petitioner was only able to lift 15 pounds, however, and

therefore her job application was rejected because of that physical limitation.

The Second Department affirmed a finding of no probable cause and dismissal of the complaint by the New York State Division of Human Rights ("the Division"). The court held that there was substantial evidence to support the Division's finding that the petitioner/employee had a disability which prevented her from "performing the requirements of the position in a reasonable manner." *Id.* The court reached that conclusion even though the employee would only have been required to lift when filling in for vacations staff nurses; it was not one of her principal duties.

Similarly, in *Lamarre v. Granville Central School*, 106 A.D.2d 838, 484 N.Y.S.2d 236 (3rd Dep't 1984), the Division dismissed petitioner's complaint of discrimination based upon physical disability and the court confirmed that determination. The petitioner therein was terminated as a custodian from the school district because he was physically incapable of performing some of the duties required of a custodian. For example, petitioner's treating physician expressly stated that petitioner could not climb ladders and that he could not do repetitive lifting—both tasks required to be performed by all custodians. In light of the foregoing, the court found that the Division had a rational basis for finding that petitioner was not discriminated against when he was "terminated due to his inability to reasonably do what the position requires." *Id.* at 839, 484 N.Y.S.2d at 237.

Relying upon those cases, among others, defendants correctly contend that plaintiff was unable to perform his job in a reasonable manner in that he could not fulfill the Power Pool's commitment that he be available 25% of his work time to deliver the ET & T program. Contrary to plaintiff's assertion, there is nothing in the case law supporting his position that he is protected under the Human Rights Law so long as he could perform his "principal" duties. Indeed, as defendants pointed out, the court's holding in *Schor* directly contradicts plaintiff's assertion. Obviously in *Schor* the

lifting requirement was not the most important or principal activity of an IV nurse; yet the court held that petitioner's inability to meet that requirement removed her from the protection of the Human Rights Law. Although not stated by the court, implicit in that holding was a finding that because the hospital had a legitimate, non-discriminatory reason for rejecting petitioner's job application, petitioner could not state a Human Rights Law claim.

Likewise, in the present case plaintiff's termination did not violate the Human Rights Law because defendants had a legitimate, non-discriminatory reason for discharging plaintiff. Specifically, that he was unable to perform one of the required aspects of his job—driving to places to present the ET & T program. Moreover, as defendants also state, their efforts to find plaintiff another position indicate that plaintiff's termination was only because he could not perform his driving duties; it was not because of his alleged alcoholism. Thus, the fact that defendants have met their burden of showing a legitimate, non-discriminatory reason for terminating plaintiff provides additional support for granting defendants' motion on this cause of action.

■ Finally, again assuming a *prima facie* showing of discrimination, coupled with the fact that defendants have shown a legitimate, non-discriminatory reason for plaintiff's termination, plaintiff is entitled to show that there are factual issues showing that the stated reason for his termination (inability to drive) was merely a pretext for discrimination. *Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). That ultimate burden may be satisfied "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* (quoting *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981)). This plaintiff has not come forth with any evidence which would satisfy even that lenient standard, however.

Plaintiff makes several allegations which he claims show that the reason given for his termination was simply a pretext for discrimination. The record is barren, however, of evidence to support those conclusory allegations. First, plaintiff claims that Mr. Balet "spontaneously" eliminated plaintiff's teacher-demonstrator position. Mr. Balet and the chairperson of the Public Relations Committee both testified, though, that due to a shift in resources to other programs and the members wish to reduce ET & T program expenses, the scope of the ET & T program had been the subject of ongoing discussions. Balet Deposition at p. 82; Burdash Deposition at p. 14–17. According to Mr. Balet, he began considering the elimination of plaintiff's position in late 1984, for numerous reasons and plaintiff has not disputed any of those reasons. *See* Balet Affidavit at pars. 22, 23, 28 and 29. Thus, the evidence plainly contradicts plaintiff's bald assertion.

Moreover, the record as it is now constituted shows that Mr. Balet followed the usual procedure in eliminating plaintiff's position. Mr. Balet initially recommended the elimination of plaintiff's position and that recommendation was reviewed and approved by the Education Subcommittee and the Public Relations Committee. Gosling Deposition at p. 11, 21–22, and Exs. O and P thereto. Plaintiff attempts to raise an issue of fact by asserting that Mr. Balet inconsistently testified regarding whether he recommended the elimination of the position or actually made the decision. As defendants cogently stated, however:

A fair reading of the testimony demonstrates that it is consistent with Balet's explanation that he made the initial decision to recommend the elimination of the position, but that the final authority rested with the Public Relations Committee. Balet's failure to recall whether he specifically informed O'Keefe of his recommendation at the April 11, 1985 meeting does not discredit his explanation and does not provide affirmative evidence of pretext.

Defendants' Reply Memorandum of Law at p. 15–16 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256–57, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Martin v. Citibank, N.A.,* 762 F.2d 212, 217–18 (2d Cir.1985)).

Nor has plaintiff disputed the evidence put forth by defendants establishing that his other duties were either discontinued or reassigned. Finally, the evidence before the court belies plaintiff's contention that the search for a position for him with NiMo was somehow insufficient. NiMo's Manager of Employee Relations–East and System Public Affairs Director both fully and convincingly explained that plaintiff either was not qualified for the positions or the positions were not available when the job search for plaintiff was conducted. *See* Conway Reply Affidavit (5/20/88) and Hull Reply Affidavit (5/24/88).

In light of the foregoing, the court is simply not persuaded that defendants were more likely motivated by a discriminatory reason when they terminated plaintiff. Nor has plaintiff convinced the court that the reason given for his termination is unworthy of credence. Consequently, because plaintiff has not made out a *prima facie* showing of discrimination and because he has not proffered any evidence even tending to show a factual issue regarding whether the reason given for his termination was pretextual, defendants' motion for summary judgment is granted with respect to plaintiff's Human Rights Law cause of action.

## II. Rehabilitation Act

■ Plaintiff's second cause of action is based upon § 504 of the Rehabilitation Act of 1973 ("the Act"). Section 504 prohibits discrimination against handicapped persons in "any program or activity receiving Federal financial assistance." 29 U.S.C. § 794 (West Supp.1988). Specifically, § 504 states, in relevant part:

> No otherwise qualified individual with handicaps in the United States, ..., shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination *under any program or activity receiving Federal financial assistance* or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794 (West Supp.1988) (emphasis added). Federal financial assistance, as it is used in § 504 means:

> [A]ny grant, loan, contract (other than a procurement contract or a contract of insurance or guaranty), or any other arrangement by which the agency provides or otherwise makes available assistance in the form of:
>
> (1) Funds;
>
> (2) Services of Federal personnel; or
>
> (3) Real and personal property or any interest in or use of such property, including:
>
> > (i) Transfers or lease of such property for less than fair market value or for reduced consideration; and
> >
> > (ii) Proceeds from a subsequent transfer or lease of such property if the Federal share of its fair market value is not returned to the Federal Government.

28 C.F.R. § 41.3(e) (1988).

Defendants assert that the undisputed material facts show that plaintiff was not employed in any program or activity receiving federal financial assistance, and thus summary judgment should be granted with respect to plaintiff's § 504 cause of action. Plaintiff counters that the undisputed material facts demonstrate that he directly participated in the ET & T program which received federal financial assistance; and therefore his § 504 claim must stand. The critical issue here is whether defendants are recipients of federal financial assistance for purposes of § 504. Stated somewhat differently, the issue is whether the fact that plaintiff's employer had a contract with an entity (Oak Ridge) that received federal financial assistance renders § 504 applicable here.

Although not mentioned by either party, the Supreme Court's decision in *U.S. Dept. of Transp. v. Paralyzed Veterans,* 477 U.S. 597, 106 S.Ct. 2705, 91 L.Ed.2d 494 (1986), is determinative here. In *Para-*

*lyzed Veterans*, the Supreme Court considered the issue of whether an entity is the recipient of federal assistance for § 504 purposes. In discussing the scope of that statute, the Court explained:

> Congress limited the scope of section 504 to those who actually "receive" federal financial assistance because it sought to impose section 504 coverage as a form of contractual cost of the recipient's agreement to accept the federal funds. "Congress apparently determined that it would require contractors and grantees to bear the costs of providing employment for the handicapped as a *quid pro quo* for the receipt of federal funds."

*Id.* at 605, 106 S.Ct. at 2711, (quoting *Consolidated Rail Corporation v. Darrone*, 465 U.S. 624, 633, n. 13, 104 S.Ct. 1248, n. 13, 79 L.Ed.2d 568 (1984)). The Court further explained:

> By limiting coverage to recipients, Congress imposes the obligations of section 504 upon those who are in a position to accept or reject those obligations as a part of the decision whether or not to "receive" federal funds.

*Id.* Finally, after reviewing the underlying intent of § 504, the Court went on to state that § 504 only "covers those who receive the aid, *but does not extend as far as those who benefit from it.*" *Id.*, 477 U.S. at 607, 106 S.Ct. at 2712 (emphasis added). Thus, after *Paralyzed Veterans*, it is essential to identify the recipient of the federal assistance.

In the present case, defendants NiMo and the Power Pool clearly did not receive any federal financial assistance for the ET & T program. Only Oak Ridge University received such assistance, in the form of Department of Energy fund and funds from "other federal sources." It is clear that Oak Ridge's receipt of federal financial assistance prohibits it from discriminating in violation of § 504; but plaintiff is not claiming that Oak Ridge discriminated against him. Instead, he is claiming only that NiMo and the Power Pool discriminated against him. While it can certainly be argued that NiMo, and the Power Pool

in particular, received benefits from the ET & T program, that fact does not mean that they are recipients of federal financial assistance within the meaning of § 504. *See, Paralyzed Veterans*, 477 U.S. at 607, 106 S.Ct. at 2712 ("Indirect economic benefits" do not trigger coverage under § 504.) Consequently, because plaintiff cannot show that defendants received federal financial assistance for § 504 purposes, defendants' summary judgment motion with respect to that claim is granted.

That conclusion is in keeping with the Congressional intent as expressed by the Supreme Court in *Paralyzed Veterans*. Specifically, because defendants did not receive federal financial assistance they were not in a position to accept or reject those concomitant obligations, such as compliance with § 504. Obviously these defendants should not be required to comply with § 504 simply because of the fortuitous circumstance that they had a contract with a third party which in turn receives federal financial assistance. Indeed, in *Paralyzed Veterans*, the Court expressly rejected the Court of Appeal's view that "various industries and institutions would become part of a federally-assisted program or activity, not because they had received federal financial assistance, but because they are 'inextricably intertwined' with an institution that has." *Id.* at 610, 106 S.Ct. at 2714. Thus, because defendants were not recipients of federal financial assistance, their motion for summary judgment on plaintiff's § 504 cause of action must be granted.

*III. Contract Claim*

Plaintiff's third cause of action is for breach of an alleged oral employment agreement. The law is well settled in New York that employment is at will and can be terminated at any time by either party, unless the duration of an employment contract is explicitly set forth. *Wright v. Cayan*, 817 F.2d 999, 1002 (2d Cir.), *cert. denied*, — U.S. —, 108 S.Ct. 157, 98 L.Ed.2d 112 (1987) (citations omitted). But, "if there were an express limitation on the employer's right of discharge it would be given effect even though the employment

contract was of indefinite duration." *Id.* (quoting *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 305, 461 N.Y.S.2d 232, 237, 448 N.E.2d 86, 91 (1983)). Based upon the foregoing, defendants argue that because plaintiff was hired for an indefinite term, his employment was presumed to be terminable at will; and plaintiff cannot rebut that presumption.

Relying upon *Weiner v. McGraw–Hill, Inc.*, 57 N.Y.2d 458, 457 N.Y.S.2d 193, 443 N.E.2d 441 (1982), plaintiff contends that he has rebutted any presumption of at-will employment, and that he has shown an express limitation on the Power Pool's right to dismiss him. In *Weiner*, the Court of Appeals did recognize an exception to the employment-at-will doctrine. That exception is extremely narrow, however. The plaintiff in *Weiner* was able to sustain a breach of contract action based upon the following set of circumstances:

1) [P]laintiff was induced to leave Prentice Hall [his prior employment] with the assurance that McGraw–Hill would not discharge him without cause;

2) [T]his assurance was incorporated into the employment application;

3) [P]laintiff rejected other offers of employment in reliance on the assurance; and

4) [A]ppellant [plaintiff] alleged that, on several occasions when he had recommended that certain of his subordinates be dismissed, he was instructed by his supervisors to proceed in strict compliance with the handbook and policy manuals because employees could be discharged only for just cause.

*Id.* at 465–466, 457 N.Y.S.2d at 197, 443 N.E.2d at 445.

In an effort to come within the narrow *Weiner* exception, plaintiff asserts that an express limitation on the right of discharge was made to him by defendants in the form of oral statements that he was "on loan" or "permanent assignment" to the Power Pool and that he "would be placed back at Niagara Mohawk in the event that his position with the Power Pool was terminated." O'Keefe Affidavit at par. 3. Plaintiff claims that Mr. Gosling made those oral statements to him when plaintiff interviewed for the teacher-demonstrator position.

As defendants pointed out, however, those averments seem to contradict plaintiff's deposition testimony. In particular, plaintiff testified that he did not know when the alleged oral contract was entered into; and he then testified that Mr. Balet implied such an agreement, but Mr. Balet did not become Power Pool's Executive Director until several years *after* plaintiff was hired by Power Pool. Given that deposition testimony, plaintiff cannot make the requisite showing that the alleged assurance of job security was "allegedly promised at the time he accepted the employment." *Weiner*, 57 N.Y.2d at 460, 457 N.Y.S.2d at 194, 443 N.E.2d at 442. In addition, there is absolutely nothing in the June, 1978 offer letter assuring plaintiff of job security. In fact, the letter is directly to the contrary. The letter expressly warned plaintiff of the possibility that the ET & T program could be cancelled and there was no mention therein of job security in the event of such cancellation. *See* Defendants' Ex. D. Accordingly, as defendants rightly stated, these alleged oral assurances upon which plaintiff supposedly relied are insufficient under established principles of New York law to state an actionable express limitation. *See, e.g., Diskin v. Consolidated Edison Co. of N.Y.*, 135 A.D.2d 775, 777, 522 N.Y.S.2d 888, 890 (2d Dep't 1987) (No breach of contract action where plaintiff relies on "little more than alleged oral assurances by upper management that he would be discharged only for cause.")

Moreover, there is nothing in the record showing plaintiff was "induced" to leave other employment by defendants alleged representations. At his deposition, plaintiff testified that the statement upon which the alleged oral agreement is based were not even made until *after* Power Pool hired plaintiff. Thus, plaintiff cannot show that he was induced to leave a prior position. In addition, plaintiff is also unable to establish inducement and reliance, as re-

quired under the *Weiner* exception, because he considered the teacher-demonstrator position to be a career promotion. *Accord, Diskin,* 135 A.D.2d at 777, 522 N.Y.S.2d at 890 (Plaintiff failed to show inducement where promoted).

In *Murphy v. American Home Products Corp.,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983), the Court of Appeals, after reviewing the current state of New York law on the issue of at-will employment, concluded:

> [A]bsent a constitutionally impermissible purpose, a statutory proscription, or an express limitation in the individual contract of employment, an employer's right at any time to terminate an employment at will remains unimpaired.

*Id.* at 305, 461 N.Y.S.2d at 237, 448 N.E.2d at 91. Relying upon that language, plaintiff contends that he was discharged because of his alcoholism, a "statutorily proscribed purpose," and thus defendants did not have the right to terminate him. Defendants accurately stated the fallacy in that theory, however. Specifically, every employee asserting a discrimination claim would automatically have a breach of contract claim. That absurd result was obviously not the intent of the New York courts. In *Murphy,* for example, while rejecting outright plaintiff's contract and tort causes of action, the court nonetheless recognized plaintiff's cause of action based upon the Human Rights Law. Therefore, there is no merit to plaintiff's assertion that he has a contract cause of action based upon his discrimination claim. That is especially so considering that, as previously discussed, plaintiff's Human Rights Law cause of action is without merit.

Finally, plaintiff attempts to salvage his contract cause of action by asserting an implied covenant of good faith and fair dealing, which the New York Court of Appeals has refused to recognize. *See Murphy v. American Home Products,* 58 N.Y.2d at 304–05, 461 N.Y.S.2d at 237, 448 N.E.2d at 91. This court, as a federal court applying state law, is reluctant to completely disregard the current law regarding employment relationships as de-fined by the courts of New York State and to impose a "significant alteration of employment relationships," a matter reserved for the state courts, and which those courts have held "is best left to the Legislature." *See Sabetay v. Sterling Drug, Inc.,* 69 N.Y.2d 329, 336, 514 N.Y.S.2d 209, 213, 506 N.E.2d 919, 923 (1987). Consequently, defendants' motion for summary judgment is also granted with respect to plaintiff's third cause of action for breach of contract.

### IV. *Prima Facie Tort*

█ In plaintiff's fourth cause of action he alleges that his discharge "lacked social and economic justification" and was "maliciously motivated." Amended Verified Complaint at par. 38. Plaintiff further alleges that he was terminated for am "improper purpose." *Id.* Although not expressly pleaded in his complaint, a review of plaintiff's motion papers indicates that in his last cause of action he is claiming that defendants committed a *prima facie* tort by discharging him "solely by virtue of being an alcoholic," despite "express terms in his alleged employment contract." *See* Plaintiff's Memorandum of Law at p. 38–39.

To establish a *prima facie* tort claim five elements must be satisfied. The first four elements are: 1) the intentional infliction of harm, (2) which results in special damages, (3) without any excuse or justification, (4) by an act or series of acts which would otherwise be lawful. *Freihofer v. Hearst Corp.,* 65 N.Y.2d 135, 142–43, 490 N.Y.S.2d 735, 741, 480 N.E.2d 349, 355 (1985) (citations omitted). In addition, it must be shown that the action may not be classified as any other recognizable tort. *Shaitelman v. Phoenix Mutual Life Insurance Co.,* 517 F.Supp. 21, 24 (S.D.N.Y.1980). In *Marcella v. ARP Films, Inc.,* 778 F.2d 112 (2d Cir.1985), the Second Circuit stated with respect to the first element that:

> [T]he *sole* motivation for the damaging acts must have been a malicious intention to injure the plaintiff. Where there are other motives, such as profit, self-interest, or business advantage, there is no recovery under the doctrine of prima facie tort.

*Id.* at 119 (emphasis added). *Accord Crimpers Promotions, Inc. v. Home Box Office, Inc.,* 554 F.Supp. 838, 849 (S.D.N.Y.1982), *aff'd,* 724 F.2d 290 (2d Cir.1983), *cert. denied,* 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984) ("Defendant's conduct must have been prompted by a malicious motive unmixed with any other and exclusively directed to injure and damage another.").

Insofar as the first element is concerned, on the record presently before the court, plaintiff cannot establish that defendants acted solely and exclusively for the purposes of inflicting harm upon him. Moreover, plaintiff has not come forth with any proof establishing that defendants terminated him or subsequently eliminated the teacher-demonstrator position *solely* to harm him. If fact, the affidavits of Mr. Balet and Mr. Gosling enumerate a host of business reasons for plaintiff's termination and for the elimination of the teacher-demonstrator position. In addition, conspicuously absent from the record is any evidence of personal animosity, hostility or malice between plaintiff and his supervisors at the Power Pool. As defendants point out, Mr. Balet even testified that both he and Mr. Gosling personally liked plaintiff; and the glowing job evaluations and letters of recommendation upon which plaintiff so heavily relies also belie plaintiff's contention that the defendants were "maliciously motivated." Balet Deposition at p. 63–64 and 75–76.

Not only has plaintiff failed to satisfy the first element of a *prima facie* tort, or at least to make out a genuine issue of material fact with respect to that element, he has also failed to plead the second element, special damages, with the requisite specificity. In *Shaitelman v. Phoenix Mutual Life Insurance Co.,* 517 F.Supp. 21 (S.D.N.Y.1980), the court held that plaintiff failed to plead special damages in a *prima facie* tort cause of action where he simply estimated and alleged damages in the amount of the round figure of $250,000.00. In so holding the court explained, " 'Round figures, with no attempt at itemization, must be deemed a representation of general damages.' " *Id.* at 25 (citations omitted).

Here, plaintiff also simply estimated and alleged damages in the amounts of $750,-000.00 in compensatory damages and $1,000,000.00 in punitive damages. *See* Amended Verified Complaint at p. 7. Therefore, although plaintiff did identify the nature of the damages he is claiming, the round figure estimate of such damages is insufficient to show special damages in light of *Shaitelman.* Hence, because plaintiff cannot establish the first element of a *prima facie* tort and because he failed to plead special damages, the second element, with the requisite specificity, defendants' motion for summary judgment on the fourth cause of action is granted. The fact that New York Courts do not recognize the tort of abusive or wrongful discharge of an at-will employee, *see Murphy v. American Home Prod. Corp.,* 58 N.Y.2d 293, 297, 461 N.Y.S.2d 232, 233, 448 N.E.2d 86, 87 (1983), provides an additional reason for granting defendants' motion with respect to the fourth cause of action.

Accordingly, it is hereby ordered that defendants' motion for summary judgment is granted in all respects and the complaint is dismissed.

IT IS SO ORDERED.