Donald C. **HEDBERG**, Plaintiff–Appellant,

v.

**INDIANA BELL TELEPHONE COMPANY, INC.**, Defendant–Appellee.

No. 94–1860.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 26, 1994.

Decided Feb. 21, 1995.

Mark R. Waterfill (argued) and Janet D. Neuenschwander, Leagre & Barnes, Indianapolis, IN, for plaintiff-appellant.

Julia F. Crowe (argued), Kim F. Ebert, Locke, Reynolds, Boyd & Weisell, and R. Anthony Prather, Indiana Bell Telephone Co., Indianapolis, IN, for defendant-appellee.

Douglas S. McDowell, Ann Elizabeth Reesman, and Kimberly L. Japinga, McGuiness & Williams, Washington, DC, for amicus curiae.

Before FLAUM and KANNE, Circuit Judges, and WILL, District Judge.[*]

KANNE, Circuit Judge.

Indiana Bell fired Donald Hedberg while he had a disease that is considered a disability under the Americans With Disabilities Act (ADA). Hedberg claims that Indiana Bell fired him because of his disability, in violation of the ADA. The district court disagreed and granted summary judgment for Indiana Bell. We affirm the district court's decision.

## I. Background

Donald Hedberg worked for Indiana Bell from 1960 until 1992. From 1985 to 1992 he was a distributor manager. He managed outside agents, whom Indiana Bell had authorized to sell its services to business customers. Hedberg was one of five distributor managers in his subgroup, called the Channel Management group, which in turn was part of the Business Sales and Service Department. During his time as a distributor manager, Hedberg won various sales and performance awards. Virgil Pund supervised the Channel Management group and was thus Hedberg's immediate superior. Robert Knowling, who was in charge of the entire Business Sales and Service Department supervised Pund.

---

[*] The Honorable Hubert L. Will, District Judge for the Northern District of Illinois, sitting by designation.

In early 1992, Indiana Bell began its "Workforce Resizing Program," a euphemism for firing workers during a company restructuring. As part of the process for deciding whom Indiana Bell should dismiss, Pund evaluated the five Channel Management group members. Pund completed an "Ameritech Development Profile Data Collection Form."[1] On that form he rated each of his subordinates in eleven areas, giving scores on a scale ranging from one to five. Pund ranked the employees in such diverse areas as leadership, negotiation, written and oral communication, and customer/quality focus. The form also required that Pund state the highest overall performance rating each employee had received in both 1990 and 1991, and it asked Pund his opinion about each employee's promotability. Pund completed a form rating Hedberg on August 31, 1992.

In addition to this detailed, formal evaluation, Pund occasionally evaluated the Channel Management group members less formally. In the summer of 1992, Knowling asked Pund to rank the five distributor managers he supervised on their current performance and managerial skills relative to each other. Pund ranked Hedberg fourth, i.e. second worst. Pund ranked one manager, David Meyers, lower.

In September 1992, Indiana Bell's decisionmakers, apparently all department heads such as Knowling, took the forms Pund and other managers had completed and distilled the information for use in deciding whom to fire. Scores in the eleven areas were added and averaged, to produce one numerical score embodying the information. The managers at each salary grade were ranked from highest to lowest score. A percentage of managers from the bottom of that ranking in each salary grade were placed in an "at risk" pool. Department heads could, after going through a complicated procedure, remove managers under them from the "at risk" pool or add managers to it. In Hedberg's salary grade approximately 50% of the managers, including Hedberg, ended up in the "at risk" pool.

Meanwhile, in early September 1992, Hedberg got a call from an Indiana Bell company physician, Dr. David Anfield, who had recently performed a routine physical examination on Hedberg. Hedberg says that in the months previous he had been suffering from fatigue. Dr. Anfield informed Hedberg that routine blood and urine tests showed a possible medical problem. On Dr. Anfield's recommendation, Hedberg immediately underwent further tests. In early September Hedberg informed Pund that he had a possible major health problem, but, wanting it kept private, he emphasized that Pund should not tell anybody else about it. In his affidavit, Pund says he told nobody until well after Indiana Bell decided to fire Hedberg.

Simultaneously, Indiana Bell's Resizing Program was moving toward reducing the size of the workforce. On October 12, 1992, eight department heads met to decide whom they should fire. Of the twenty-two managers in Hedberg's salary grade in the "at risk" pool, they fired ten, including both Hedberg and David Meyers. Five of the ten fired managers, including Meyers, had lower average scores than Hedberg on the Data Collection Form; four had higher scores. Notes that Knowling wrote on the ranking sheet written at the meeting remarked about Hedberg's performance: "Interpersonal skill problems. Doesn't come to work. Capable but [lacks] work ethic." While the final decision to fire Hedberg was made at the October 12 meeting, Hedberg was not told of his discharge until a November 16 meeting with Knowling.

Hedberg continued to undergo more tests between October 12 and November 16. He took some days off, with Pund's permission and with pay, for medical visits and treatments. Although at first Hedberg's doctors suspected he might have cancer, it turned out he had primary amyloidosis, which the parties characterize as an often fatal disease. After November 16, Hedberg appealed his firing through Indiana Bell's internal appeal procedures, but the company denied his appeal.

On October 10, 1993, Hedberg sued Indiana Bell in federal court, asking for damages under the Americans with Disabilities

---

1. Indiana Bell is "Ameritech Indiana."

Act. Hedberg claimed that Indiana Bell had fired him because he had primary amyloidosis, which both parties agree constitutes a "disability" as the ADA defines the term. On March 14, 1994, the district court granted Indiana Bell's motion for summary judgment, reasoning that "Hedberg cannot succeed on his ADA claim if the decision to terminate Hedberg was reached without knowledge that Hedberg had a disability." Hedberg appeals.

## II. Analysis

We review a district court's grant of summary judgment *de novo*. *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1122 (7th Cir.1994). A district court must grant summary judgment where the record shows that "there is no genuine issue as to any material fact." FED.R.CIV.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). If no reasonable jury could find for the party opposing the motion, it must be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2507, 91 L.Ed.2d 202 (1986); *Roger v. Yellow Freight Systems, Inc.*, 21 F.3d 146, 149 (7th Cir.1994). Conclusory allegations by the party opposing the motion cannot defeat the motion. *First Commodity Traders v. Heinold Commodities*, 766 F.2d 1007, 1011 (7th Cir.1985). The party opposing the motion must come forward with evidence of a genuine factual dispute. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2553. We draw all reasonable inferences in favor of the nonmoving party. *Harriston v. Chicago Tribune Co.*, 992 F.2d 697, 704 (7th Cir.1993).

The ADA provides that no employer "shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... the hiring, advancement or discharge of employees...." 42 U.S.C. § 12112. Hedberg bases his claim on this section.

Indiana Bell offered sworn affidavits to the district court from Knowling and the other decisionmakers, stating that they had not known of Hedberg's disability when they decided to discharge him. They stated that they based their firing decision primarily on the low ranking Hedberg received on the standard form. Hedberg did not try to controvert those affidavits with his own affidavits or with other evidence. The district court therefore concluded that there was no real issue that Knowling and the others did not know of Hedberg's disability when they decided to discharge him on October 12. The court further reasoned that without knowledge of Hedberg's disability, Indiana Bell could not possibly have fired Hedberg "because of" his disability, as the ADA requires for liability to attach. Therefore, because there was no genuine issue regarding that material fact, the district court granted summary judgment in favor of Indiana Bell. Hedberg attacks the district court's decision.

Hedberg admits that an employer must know about a fired employee's disability for there to be ADA liability, conceding the obvious logic of the argument. But he argues that there is indeed a genuine issue about whether Indiana Bell knew about his disability on October 12. Hedberg argues that because Pund admits he reported occasionally to Knowling about the performance of the members of the Channel Management group, it is reasonable to infer that Pund told Knowling about Hedberg's disability before October 12, when the firing decisions were made.

Hedberg admits that Pund could not have known about his disability on August 31, when he completed his evaluation form, because Hedberg himself only found out in early September. Hedberg and Pund are not sure when exactly Hedberg told Pund about his illness, but they agree it was sometime in mid- to late September. The parties agree that Knowling knew something about Hedberg's illness on November 16, because he asked Hedberg at that meeting about the results of the medical tests Hedberg had undergone. Knowling stated in his affidavit that he had learned of Hedberg's illness around November 11.

Hedberg's desired inference, that Pund must have told Knowling of Hedberg's illness before October 12, is not reasonable; it is unsupported speculation. Such speculation

does not meet a party's burden of producing some defense to a summary judgment motion. *Slowiak v. Land O'Lakes*, 987 F.2d 1293, 1295 (7th Cir.1993); *Karazanos v. Navistar Int'l. Transp. Corp.*, 948 F.2d 332, 337 (7th Cir.1991). Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment. The undisputed facts show the unreasonableness of Hedberg's suggested inference: Pund's sworn statement that he did not tell Knowling of Hedberg's illness before November 11, the very short time between Pund's learning that Hedberg might be ill and the decision by Knowling to fire Hedberg, and Hedberg's own urgent request to Pund that Pund not tell anyone that Hedberg was sick. Thus, we agree with the district court's conclusion that Hedberg's argument was mere conjecture, unsupported by any evidence or reasonable inference. That the decisionmakers apparently discussed Hedberg's occasional tardiness is not an indication that they knew of Hedberg's disability. The district court properly found that Hedberg had not met his burden of producing some evidence to raise a genuine issue of Indiana Bell's knowledge on October 12.[2]

We briefly further discuss the effect of an employer's lack of knowledge about an employee's disability, especially given the interest of the *amicus curiae* in the issue.[3] No other Circuit has directly addressed the question. It may be rare that there is no genuine dispute whether an employer knew about an employee's disability when it decided to fire an employee. This question does not arise in most cases of alleged employment discrimination. In race or sex discrimination, the protected characteristic of the employee is immediately obvious to the employer, but that is not always the case with disability discrimination. It is true that an employer will automatically know of many disabilities. For example, an employer would know that a person in a wheelchair, or with some other obvious physical limitation, had a disability. Furthermore, an employer may actually know of disabilities that are not immediately obvious: the employee may ask for an accommodation under the ADA, or he may inform the employer gratuitously, for example. In those cases, which are likely the vast majority, the issue we face would not arise: there could not be a genuine issue that the employer had no knowledge of a disability.

■ However, unlike with race or sex discrimination, there are situations in alleged disability discrimination cases where an employer clearly did not know and could not have known of an employee's disability. We think that an employer cannot be liable under the ADA for firing an employee when it indisputably had no knowledge of the disability. This is supported both by simple logic and by the conclusions of other courts that have considered analogous issues.

At the most basic level, it is intuitively clear when viewing the ADA's language in a straightforward manner that an employer cannot fire an employee "because of" a disability unless it knows of the disability. If it does not know of the disability, the employer is firing the employee "because of" some other reason.

Other courts have recognized this logic. The Sixth Circuit reached this conclusion in a similar context in *Landefeld v. Marion General Hospital*, 994 F.2d 1178 (6th Cir.1993). *Landefeld* was an appeal from summary judgment granted to an employer defendant in a claim under the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, which forbids discrimination on the basis of disability by branches of the federal government and by entities funded by the federal government. The language of the Rehabilitation Act is substantially identical to the language of the ADA; it forbids discrimination "by reason of

---

**2.** Hedberg also argues that it is reasonable to infer that Dr. Anfield told Knowling about Hedberg's illness, despite Dr. Anfield's affidavit to the contrary. This is also an utterly unsupported conjecture. Summary judgment is designed to weed out such speculation.

**3.** The Equal Employment Advisory Council filed an amicus brief with the court on this issue.

his handicap."[4] 29 U.S.C. § 794. In *Landefeld,* a physician employed by a hospital had been caught stealing mail from other physicians' mailboxes. He had been under psychiatric care, and apparently he had a mental disorder that caused his misbehavior. The hospital's Board of Directors fired Landefeld, and Landefeld produced no evidence that at the time of the firing the Board knew of his mental illness. The Sixth Circuit held that, because there was no genuine issue that those who made the decision to fire Landefeld knew nothing of his handicap, the employer could not be liable. *Landefeld,* 994 F.2d at 1181–82.

Other courts have reached the same conclusion in analogous situations. *See Mazzarella v. United States Postal Serv.,* 849 F.Supp. 89, 96–97 (D.Mass.1994) (holding that lack of knowledge of decisionmaker who fired an employee with a mental disorder precluded liability under Rehabilitation Act); *Grinstead v. Pool Co. of Texas,* 1994 WL 25515 (E.D.La.1994) (holding that there can be no liability under the ADA for firing a worker with a 20% disability rating when the plaintiff produced no evidence that the employer knew of disability), *aff'd without op.,* 26 F.3d 1118 (5th Cir.1994); *McIntyre v. Kroger Co.,* 863 F.Supp. 355, 358–59 (N.D.Tex.1994) (holding that there could be no liability under Texas human rights law that forbade discharge "because of disability" for employer's discharge of mentally ill employee, where plaintiff produced no evidence that the employer knew of disability); *Dutson v. Farmers Insurance Exchange,* 815 F.Supp. 349, 352 (D.Ore.1993) (holding that where there was no evidence that an employer knew of its employee's being HIV-positive, the employer could not have illegally discriminated against the employee), *aff'd without op.,* 35 F.3d 570 (9th Cir.1994); *O'Keefe v.*

*Niagara Mohawk Power Corp.,* 714 F.Supp. 622, 627 (N.D.N.Y.1989) (holding that there could be no liability under New York human rights law, forbidding discharge "because of disability," where there was no genuine issue of material fact that those who decided to fire plaintiff knew nothing of his alcoholism).

Criteria that courts have developed regarding religious discrimination also shed light on the issue. In religious discrimination, as in some cases of disability discrimination, the employee's protected characteristic may not be immediately obvious. We have held that establishing a prima facie case of religious discrimination under Title VII requires the employee to demonstrate that he informed the employer of his religious beliefs. *See Beasley v. Health Care Serv. Corp.,* 940 F.2d 1085, 1088 (7th Cir.1991); *Redmond v. GAF Corp.,* 574 F.2d 897, 901–02 (7th Cir.1978).[5]

Hedberg, despite the foregoing, argues that his employer's actual knowledge of the disability is irrelevant in his case. He maintains that firing someone "because of" the symptoms of his disability is the same as firing him "because of" the disability itself. Under this theory, even if the employer knew nothing about the disability, if he knew of the symptoms and fired the employee because of them, the ADA binds him. Hedberg points to the notes jotted at the October 12 meeting on his ranking form, some of them to the effect that he was tardy and apparently lacked "work ethic" (which we take to mean perceived laziness). He says that he was often fatigued during 1992 because of the illness and that fatigue caused those poor work habits. Hedberg claims that Indiana Bell's firing him because of symptoms of his disability is exactly the same as firing him because of his disability.[6]

---

4. Congress has since changed the statute to read "disability" instead of "handicap." *See* 29 U.S.C. § 794 (Supp.1994).

5. We need not decide the precise elements of a prima facie case of discrimination under the ADA. Where disabilities are not obvious, it may be that part of the plaintiff's prima facie case would be to demonstrate knowledge of the disability on the employer's part, as is necessary for Title VII religious discrimination. *See Beasley,* 940 F.2d at 1088; *Redmond,* 574 F.2d at 901–02.

All we decide today, however, is that where there is no genuine issue that an employer did not know of an employee's disability when it decided to fire him, the employee cannot make out a case of discriminatory discharge.

6. Technically, perceived tardiness and laziness are not really symptoms of Hedberg's illness. Fatigue is a symptom, because it is a direct effect of the illness. Tardiness is one step removed: it is the product of the symptom, as would be, for example, a car wreck caused by the fatigue.

Initially, we note that Hedberg was not fired merely because of his tardiness and lack of work ethic. Hedberg was fired because he did worse than other employees in several areas completely unrelated to the narrow area of work habits. But even had Hedberg been discharged simply because of his perceived tardiness and laziness, Indiana Bell would not thereby have violated the ADA.

Employers fire people every day. Perhaps the most common criterion for choosing whom to fire is which employees perform a job better or worse than others. Allowing liability when an employer indisputably had no knowledge of the disability, but knew of the disability's effects, far removed from the disability itself and with no obvious link to the disability, would create an enormous sphere of potential liability. Tardiness and laziness have many causes, few of them based in illness. The ADA hardly requires that merely because some perceived tardiness and laziness is rooted in disability, an employer who has not been informed of the disability, and who has no reason to know of the disability, is bound to retain all apparently tardy and lazy employees on the chance that they may have a disability that causes their behavior. The ADA does not require clairvoyance.

Of course, if an employee tells his employer that he has a disability, the employer then knows of the disability, and the ADA's further requirements bind the employer. Furthermore, it may be that some symptoms are so obviously manifestations of an underlying disability that it would be reasonable to infer that an employer actually knew of the disability. For example, it would appear to most observers that an employee who suffers frequent seizures at work likely has some

disability. If an employer admitted it fired the employee because of his frequent seizures, a reasonable inference might be drawn that the employer knew the employee had a disability. Nor should deliberate ignorance insulate an employer from liability.[7]

Naturally, even when the employer does know of an employee's disability, that is not the end of the ADA inquiry. The employer may fire the employee because he cannot perform his job adequately, *i.e.* he is not a "qualified individual" within the meaning of the ADA. *See* 42 U.S.C. § 12111(8). If the disability affects the employee's work ability, the employer must then consider if a "reasonable accommodation" can be made. *See Vande Zande v. Wisconsin Dept. of Admin.,* 44 F.3d 538 (7th Cir.1995). The ADA does not, for example, necessarily insulate from discharge someone whose underlying disability causes him to be frequently drunk on the job. The ADA is not a job insurance policy, but rather a congressional scheme for correcting illegitimate inequities the disabled face. *See* 42 U.S.C. § 12101(a). But the scope of those questions do not concern us today: our conclusion is not complex and requires no weighing of "reasonableness." Where there is no real issue that an employer who fired a disabled employee knew nothing of the disability, summary judgment in favor of the employer is appropriate. We AFFIRM the district court's decision.

Thus, Hedberg is really asking that an unknowing employer not only be liable for firing an individual because of the symptoms of a disability, but also be liable for firing an individual on the basis of any action or characteristic that would not exist but for the disability. The scope of such liability would be extremely broad.

7. Hedberg points us to *Hogarth v. Thornburgh,* 833 F.Supp. 1077 (S.D.N.Y.1993), involving discrimination under the Rehabilitation Act, as support for his position. *Hogarth,* however, involved a situation where the employee's mental

illness was completely obvious, and thus the employer must have known of the employee's disability. The employer, however, claimed that it fired the employee because of his symptoms, not because of his disability. The court found that under the circumstances that was a false distinction: pointing to the symptoms was a transparent method of firing because of the disability. *Hogarth,* however, has no application where the employer indisputably knew nothing about the employee's disability.