**Donald M. STEWART, Plaintiff–Appellant,**

v.

**COUNTY OF BROWN and Sheriff Michael Donart, Defendants–Appellees.**

No. 95–2776.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 9, 1996.

Decided June 12, 1996.

John C. Talis, Lawton & Cates (argued), Madison, WI, for plaintiff-appellant.

Anna M. Pepelnjak (argued), Michele M. Ford, Crivello, Carlson, Mentkowski & Steeves, Milwaukee, WI, for defendants-appellees.

Before HARLINGTON WOOD, Jr., ESCHBACH, and DIANE P. WOOD, JJ.

DIANE P. WOOD, Circuit Judge.

The Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and the Rehabilitation Act of 1973 (Rehabilitation Act), 29 U.S.C. § 701 *et seq.*, forbid discrimination against qualified disabled individuals and impose a duty on employers to make reasonable accommodations to known physical or mental limitations. In this case, Donald Stewart claims that Brown County, Wisconsin, and the Sheriff of Brown County, Michael Donart, violated those duties with respect to him. The district court granted summary judgment for the defendants, finding that Stewart's claim based on a perceived mental disability was barred by the statute of limitations and his Rehabilitation Act claim failed on the merits. We affirm.

I

Stewart started working in the Brown County Sheriff's Department in 1978 as a patrol deputy. Over the years, he received many commendations for his performance. On the other hand, his work history showed

that he tended to be excitable. Unfortunately, he also began to suffer from stress, induced both by high pressure situations on the job and by the fact that he was also running a fulltime business on the side, which meant he got very little sleep. In May 1988, he had a complete physical and was diagnosed with depression. Nine months later, in February 1989, he returned to his physician and was again diagnosed with depression. On his doctor's advice, he took a leave from work in February 1989, advising the Brown County Sheriff's Department that he was being treated by a psychologist.

In mid-March 1989, Stewart's doctor concluded that he could return to his job as a deputy sheriff. When Stewart furnished a copy of this opinion to Sheriff Donart, however, Donart indicated that he wanted Stewart to undergo further psychological testing. The doctor designated by the Department, Dr. Johnson, who had access to Stewart's entire personnel file, concluded on May 15, 1989, that Stewart was fit for duty. A second doctor, Dr. Richard Domrath, then conducted a battery of psychological tests, the results of which were furnished to Dr. Johnson. On August 1, 1989, Dr. Johnson concluded again that Stewart could return to duty. Accordingly, on August 3, 1989, Donart reinstated him.

Stewart's problems, however, were not over. In particular, he displayed extreme bias against the residents of a southern Brown County community known as Greenleaf. At the Greenleaf Firemen's Picnic, for example, Stewart and other Brown County Sheriff's Department deputies had a serious altercation with Greenleaf residents attending the picnic, which resulted in numerous arrests. Stewart, among others, was charged with violating departmental rules regarding the excessive use of force in conjunction with those arrests. Later, in an investigation of the incident, Stewart referred to the residents of Greenleaf as "the kind of sewer trash that had been puked up in the south end of Brown County," and made a number of other equally derogatory remarks.

As a result of the Greenleaf investigation, Sheriff Donart approved a recommendation that Stewart be discharged for his role in the incident. Sheriff Donart agreed to submit the matter to arbitration, and, while the matter was pending, Stewart was suspended with pay. In January 1993, the arbitrator found that Stewart had indeed used excessive force and had failed to demonstrate remorse, but he reduced the sanction to a 30–day suspension without pay. The arbitrator also permitted the Department to obtain a certification of Stewart's medical and psychological health before returning to duty and recommended a Dr. Conroy as an independent medical examiner. In a report filed on March 9, 1993, Dr. Conroy concluded that Stewart was fit to return to duty.

Notwithstanding Dr. Conroy's recommendation, Sheriff Donart decided not to reputize Stewart. In a letter dated April 22, 1993, he informed Stewart that he would be reassigned to a courthouse security position effective April 26, 1993. In his new position, Stewart sat in the courthouse security room watching video screens that monitored courthouse activity. The ergonomics of the security room, however, did not meet Stewart's needs. On October 14, 1993, Stewart presented the Department with a letter from a Dr. Wautlet, his chiropractor, reporting that Stewart suffered from cervicodorsal spinal symptoms (i.e., neck and back pains) and headaches. To relieve Stewart's symptoms, Dr. Wautlet recommended that Stewart should sit at slightly above eye level with the monitor, and that he should rotate his position every 30 to 45 minutes (later modified to allow for one-hour intervals). Stewart also requested that the lighting in the courthouse security room be changed to soft lighting, and that he be provided with a more comfortable chair.

Upon receipt of the letter, Sheriff Donart forwarded it to the Brown County Superintendent of Buildings & Grounds, Mark Keckeisen, and he informed Stewart's lawyer he had taken this action. Keckeisen studied the situation personally, and he consulted other sources of information, including a textbook and the State Department of Corrections. In January 1994, Brown County revamped the security room—though not fast enough for Stewart, who on Dr. Wautlet's orders took a leave of absence from mid-December

1993 through mid-February 1994. In order to address the concern about the viewing angle for the video monitors, the County built a 4 1/2 inch platform in the security room. They installed mini-blinds on six courthouse windows and placed film on the doors of the security room to minimize glare. When Dr. Wautlet advised them that the platform did not address his concerns, the County purchased an ergonomic chair for Stewart. In June 1994, it lowered the monitors. It also modified his work schedule, which according to his description in his deposition appears to have been exceptionally light: From 9:00 a.m. until 10:00 a.m., I am in the monitoring room.

> From 10:00 a.m. until twelve noon, I am free to roam about the courthouse. From noon until 1:00, I come back into the monitoring room. From 1:00 until 1:45, I leave the courthouse to take my lunch. From 1:45 until 3:00 p.m., I go over to the Y, and I do a variety of exercises. From 3:00 until 4:00, I come back and wander around the courthouse, and, from 4:00 until 5:00 p.m., I man the monitoring room. At 5:00 p.m., I go home.

Notwithstanding all these efforts, Stewart continued to be dissatisfied. He filed a charge of disability discrimination with the Equal Employment Opportunity Commission (EEOC) on March 4, 1994, obtained a right to sue letter on May 31, 1994, and filed this case on August 1, 1994.

## II

Stewart presented four claims to the district court: an ADA claim based on perceived mental disability, complaining about his transfer to the court security position; a Rehabilitation Act claim on the same grounds; an ADA discrimination claim based on the defendants' alleged failure to accommodate his physical problems in the court security room; and a Rehabilitation Act claim on the same grounds. With the agreement of the parties, the court concluded that the ADA and the Rehabilitation Act provide identical substantive protection for the claims in this case. This meant, in effect, that only two claims were presented: the mental disability claim, and the failure to accommodate physical disabilities claim.

On the defendants' motion for summary judgment, the district court first concluded that the ADA-based mental disability claim was time-barred. In order to recover for violations of Title I of the ADA, a plaintiff must file a charge of discrimination with the EEOC within 180 days of the alleged violation (if he does not file an initial charge with a state agency). 42 U.S.C. § 12117(a). Here, Stewart complained that Sheriff Donart discriminated against him based on a mental disability no later than April 22, 1993, when he decided to reassign Stewart to the courtroom security position. Stewart's March 4, 1994, charge of discrimination was thus plainly too late. The district court rejected Stewart's argument that the mental disability claim is saved by his continuing employment in the security position, noting that Stewart presented no evidence of any connection between the alleged refusal to accommodate his physical disability and the alleged discrimination based upon perceived mental disability.

With respect to Rehabilitation Act theory for the mental disability claim, the district court found that Stewart had failed to meet his summary judgment burden of demonstrating evidence from which a reasonable trier of fact could find a violation. The key missing evidence was any indication that Sheriff Donart thought that Stewart suffered from mental illness. At best, the court noted, the record showed that Sheriff Donart hoped the various psychological evaluations would show that Stewart was unfit for duty, but when they uniformly did not, Sheriff Donart transferred him anyway for reasons related to his attitude and professional history.

Finally, the district court found on Stewart's physical disability accommodation claims that Brown County and the Sheriff had reasonably accommodated as a matter of law. Reasonable accommodation, the court commented, does not require an employer to provide literally everything the disabled employee requests. The many adjustments Brown County made at Stewart's request were responsive to Stewart's complaints.

Whether or not they were enough to cure him was beside the point: neither the ADA nor the Rehabilitation Act required more.

### III

We have little to add to the district court's analysis of this case. Taking the mental disability claims first, the district court correctly found that Stewart's EEOC complaint was too late to preserve his ADA claim. The charge was filed March 4, 1994, almost eleven months after the claim accrued on April 22, 1993, with Donart's letter. Stewart's efforts to revive the claim by alleging that his transfer to courthouse security and his physical problems were part of a continuing pattern of discrimination are unavailing. In order to benefit from the "continuing discrimination" theory, Stewart must show that the alleged untimely act (the transfer) and the timely act (the failure to accommodate his physical disability) are "related enough to constitute a continuing violation." *Selan v. Kiley,* 969 F.2d 560, 564–65 (7th Cir.1992). He did not, apart from bare allegations that the County's failure to accommodate was based upon the perceived mental disability. Perhaps Stewart means to suggest that the two are sufficiently related because "but for" the discriminatory transfer, he would not have been placed in the courtroom security job, and "but for" his security job assignment, he would not have developed his back and neck problems. The law, however, does not permit such a tenuous connection between an earlier allegation of discrimination and a later one, for good reason. One of the purposes of filing a charge with the EEOC is to enable problems to be worked out without full-blown litigation. If a charge opened up the possibility of claims on every step of an employee's progression through a company that led to the alleged discrimination, employers would have no idea how much they needed to investigate and defend against. Stewart's two claims are distinct, and the district court correctly found that his ADA claim of mental disability discrimination was time-barred.

In order to prevail under the Rehabilitation Act, Stewart had to show that, though he was otherwise qualified, his employer discriminated against him on the basis of a disability within the meaning of the Act. 42 U.S.C. § 12112(a); *Roth v. Lutheran General Hospital,* 57 F.3d 1446, 1454 (7th Cir. 1995). Under both the ADA and the Rehabilitation Act, an individual is "disabled" if he or she (1) has a physical or mental impairment that substantially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment. 29 U.S.C. § 706(8)(B); 29 C.F.R. § 1613.702(a); 42 U.S.C. § 12102(2); 29 C.F.R. § 1630(2)(g); *Roth,* 57 F.3d at 1454. The phrase "major life activities" refers to "functions, such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. §§ 1613.702(c), 1630.2(i); *Roth,* 57 F.3d at 1454.

The district court correctly found that Stewart failed to demonstrate, for summary judgment purposes, that he met any of the criteria for "disability" recognized in the statutes. He claimed only that Sheriff Donart thought he was "excitable," that the Sheriff had ordered a number of psychological evaluations for him, and that Donart had stated to third persons that he considered Stewart to be emotionally or psychologically imbalanced. These factors, taken together with evidence showing Sheriff Donart's conclusion that Stewart was temperamentally unfit to serve as a sheriff's deputy, do not amount to a showing even of a perception of a mental impairment that substantially limits one or more of the major life activities set forth in the regulation. *See Byrne v. Board of Education,* 979 F.2d 560, 563 (7th Cir.1992). As Stewart himself said in his deposition, "this boils down to nothing more than personalities." We agree. As the district court noted, here it is plain that Sheriff Donart decided on the transfer only after he had been repeatedly advised that Stewart was mentally fit for work as a deputy. Stewart did not come forward with any evidence tending to show that Donart's stated reasons for the transfer were pretextual. However sincerely Stewart may believe that Donart harbored a secret belief that he was mentally disabled, it was his job to show the existence of genuinely disputed facts. He did not, and summary

judgment was therefore properly granted on this count.

■ With respect to Stewart's accommodation claims, we confess that it is difficult for us to imagine how much more Brown County could have done with the security room and the conditions of his employment to make life more comfortable, short of giving Stewart a blank check and full authority to order a complete rehab of the building. The fundamental problem with Stewart's theory is his erroneous assumption that "accommodation" means the same thing as "a perfect cure for the problem." If this were true, the statutes would require more from employers than *reasonable* accommodations.

Stewart does not dispute that Brown County took the steps outlined above. It is also plain that these steps were responsive to his complaints: building a platform for the chair would necessarily change the angle of vision for the screens; putting up mini-blinds addresses the problem of lighting and glare; purchasing a more ergonomically correct chair often helps back problems. The fact, which we assume at the summary judgment stage to be true, that Stewart continued to have head, neck, and back aches does not come close to creating a triable issue of fact on the accommodation point. Stewart never, for example, offered evidence to show that he was unable to work generally, or that he could not cope with the undemanding work schedule that Brown County gave him. On this record, no jury could fail to find that Brown County satisfied its statutory duty of reasonable accommodation.

We therefore AFFIRM the judgment of the district court.