**Brian G. DEY, Plaintiff,**

v.

**MILWAUKEE FORGE, Defendant.**

No. 94–C–1373.

United States District Court,
E.D. Wisconsin.

Oct. 29, 1996.

Robert C. Menard, Derzon, Menard & Noonan, Milwaukee, WI, for Plaintiff.

John C. Patzke, Marna M. Tess–Mattner, Brigden & Petajan, Milwaukee, WI, for Defendant.

## MEMORANDUM AND ORDER

GORENCE, United States Magistrate Judge.

On December 16, 1994, plaintiff Brian Dey commenced this action against his employer, defendant Milwaukee Forge, Inc., alleging a violation of Title I of the Americans With Disabilities Act (ADA), 42 U.S.C. §§ 12111–12117. The plaintiff was employed by the defendant, a company which is in the business of forging steel, from May 1987 until January 12, 1993, when he alleges his employment was terminated without a reasonable effort to accommodate his disability. Subsequently, the plaintiff was reemployed by Milwaukee Forge in a timekeeper position.

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it raises a federal question. Venue is proper under 28 U.S.C. § 1391. The case was assigned according to the random assignment of civil cases pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 13.03 (E.D.Wis.). The parties have consented to United States magistrate judge jurisdiction. The defendant has filed a motion for summary judgment which will now be addressed.

### Standard for Summary Judgment

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also, Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. '317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Matter of Wade,* 969 F.2d 241, 245 (7th Cir.1992); *McNeal v. Macht,* 763 F.Supp. 1458, 1460–61 (E.D.Wis. 1991). "Material facts" are those facts that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The burden of showing the needlessness of a trial—(1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law— is upon the movant.

However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Anderson,* 477 U.S. at 267, 106 S.Ct. at 2519–20; *see also, Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553 ("proper" summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves ...."); Fed.R.Civ.P. 56(e) ("When a summary judgment motion is made and supported as provided in [Rule 56(c) ], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial"). "Rule 56 *mandates* the entry of summary judgment, ... upon motion, against a party who fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. at 2552 (emphasis added).

Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to summary judgment as a matter of law. *Matter of Wade,* 969 F.2d 241, 245 (7th Cir.1992) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 [1986] ). All inferences are taken in the light most favorable to the nonmoving party. *Wade,* 969 F.2d at 245. Defeating summary judgment requires more than just a "swearing match"; rather, the nonmoving party must present some evidence that a genuine issue of material fact exists. *Wade,* 969 F.2d at 245. Nonetheless, matters of credibility are not subject to resolution upon summary judgment. *Wilson v. Williams,* 997 F.2d 348, 350 (7th Cir.1993). In ruling on a motion for summary judgment, all inferences are taken in the light most favorable to the nonmoving party. *Wade,* 969 F.2d at 245.

### Factual Background

Unless otherwise stated, the relevant facts are based upon the undisputed proposed findings of fact submitted by the parties.

Milwaukee Forge, Inc. (Milwaukee Forge) is located in Milwaukee, Wisconsin, and employs approximately 335 people in its Forge Shop, Machine Shop and office. At all times relevant to this case, employees working in the Forge Shop were members of the bargaining unit represented by the United Steelworkers International Union (Steelworkers Union) and employees working in the Machine Shop were members of the bargaining unit represented by the International Association of Machinists and Aerospace Workers (Machinists Union). Employees working in the office were not union members, but were referred to as "company workers."

During the relevant time period, plaintiff Brian Dey was a member of the Machinists Union. Milwaukee Forge's Plant Manager was plaintiff's father, Gordon Dey, who worked in this position for ten years. Wayne Stevenson, the defendant's Personnel Manager and Safety Director, reported directly to Gordon Dey. Defendant Milwaukee Forge has a policy of attempting to put employees back to work as soon as possible after a work-related injury.[1]

The plaintiff began working for Milwaukee Forge on May 8, 1987, and worked there continuously until he injured his back on March 8, 1991. At the time he was injured, the plaintiff was working as a die polisher on the first shift. The die polisher position required heavy lifting and substantial bending. On October 4, 1991, the plaintiff had back surgery, which included disc removal and spinal fusion. The surgery was performed by Sanford Larson, M.D.

On March 30, 1992, the plaintiff returned to work half-time, working four hours per day in a light duty position. Temporary light duty positions are not permanent positions, although some employees have been in light duty positions for four to five years.

After the plaintiff completed a period of therapy at Curative Rehabilitation Center, the plaintiff's treating doctor, Dr. Larson, allowed him to return to work. On July 21, 1992, Dr. Larson completed a worker's compensation report stating that the plaintiff should avoid bending and lifting, and should change position from sitting to standing at intervals. On July 27, 1992, the plaintiff returned to temporary light duty work at Milwaukee Forge for four hours per day performing a variety of jobs. During his temporary light duty work periods at Milwaukee Forge in 1992, the plaintiff was paid at the same hourly rate as he had earned as a die polisher. In September 1992, the plaintiff stopped working and entered a work hardening program at Curative Rehabilitation Center.

On September 9, 1992, Curative Workshop prepared a Rehabilitation Work Capacity Evaluation of the plaintiff. This report was provided to Milwaukee Forge and identified restrictions on standing, sitting, walking, stooping, squatting, stair climbing, weight lifting, and carrying, but did not prohibit the plaintiff from engaging in those activities.

On October 24, 1992, Dr. Larson, told the plaintiff and the defendant that the plaintiff no longer could perform the duties of the die polisher position. The die polisher position requires bending, even with modifications.

In November, 1992, William Stewart, M.D., conducted an independent medical examination (IME) of the plaintiff. Dr. Stewart pre-

---

1. The policy is different for injuries which are not work-related, but since this case involves a work-related injury, the other policy is not discussed herein.

pared a report dated November 19, 1992, in which he concluded that the plaintiff was able to return to work with a permanent 50–pound weight lifting restriction, and with the direction that he should avoid repetitive bending or lifting. (Plaintiff's Admission 30).

On December 15, 1992, Dr. Larson, wrote a report stating that the plaintiff could not return to work which required repetitive bending, lifting, more than occasional lifting of weights not greater than 30 pounds and which required continued maintenance of even a mildly flexed posture. This December 15, 1992, report gave an indication for the first time of what the plaintiff's permanent restrictions were going to be. (Deposition of Plaintiff Brian Dey [plaintiff's Dep.] at 123).

After receiving information about plaintiff's restrictions from Dr. Larson, defendant's management reviewed the plaintiff's records to determine what other skills or experience he had in order to find a job he could do within his restrictions. Because the plaintiff had held a machine hand position in 1988 for a brief time, Wayne Stevenson, Gordon Dey and Don Szydel offered that position to the plaintiff.[2] The unmodified machine hand position involves some bending, but considerably less bending than the die polisher position.

The plaintiff returned to work on December 21, 1992, and met with Szydel to discuss his duties in the machine hand position. He worked for three days at which time Milwaukee Forge closed for its annual holiday shutdown. The plaintiff returned to work when the plant reopened on January 3, 1993. Two days later, the plaintiff complained to the company nurse that his back was bothering him.

On January 6, 1993, the plaintiff angrily told Szydel that working on the shaper machine was hurting his back. Szydel suggested to the plaintiff that he "work smart" by stooping or squatting, rather than bending and setting machine dials so subsequent operations could be performed without bending. Szydel listened to plaintiff's complaints and seemed interested and willing to work with him. Szydel assigned the plaintiff to different tasks. He also suggested that the plaintiff write out a list of those tasks he could do, those he could not do, and those which caused him difficulty.

The plaintiff prepared a two-page response to Szydel's suggestion in which he stated that, within his work restrictions, he could not run the shaper, the floor mount drill press or the radial arm drill press, if unaccommodated. These machines comprised approximately 50% of the duties of the standard machine hand position. The plaintiff and Szydel reviewed plaintiff's list together. The use of an adjustable stool would have eliminated some of the bending in the shaper and drill press jobs, but some bending still would be necessary to perform the duties of the unmodified machine hand position. (Plaintiffs Dep. at 147–48).

With the right stools, the vertical milling machine and the horizontal milling machine would not have required any bending. (Plaintiff's Dep. at 147). With the right type of adjustable stool, the shaper job would require "very little" bending. (Plaintiff's Dep. at 148). The drill press would also require some bending, even with the use of a stool. (Plaintiff's Dep. at 148–49). The machine hand position would involve some bending, even with all accommodations. (Plaintiff's Dep. at 149).

Szydel limited the plaintiff's job assignments to tasks within his restrictions. The

---

**2.** A person in the machine hand position, if the position is unmodified, is required to be able to operate all of the following machines/tools and perform all of the following functions. These are

essential functions of the unmodified machine hand position at Milwaukee Forge. (Plaintiff's Admission 39).

| | | |
|---|---|---|
| Shaper | Horizontal Power Band Saw | Swing Hammer |
| Table Layouts | Vertical Power Band Saw | Sledge Hammer |
| Floor Mount Drill Press | Moving Medium to Large | Hand Truck |
| Radial Arm Drill Press | Objects | Hand–Held File |
| Vertical Milling Machine | Wrenches | Machine Layouts |
| Horizontal Milling Machine | Hand–Held Grinder | Hand–Held Drill |
| Pedestal Grinder | Heavy Hand–Held Grinder | Power Hack Saw |

plaintiff was not required to do any work requiring bending or lifting in excess of thirty pounds. Szydel assigned very light duties to the plaintiff, only some of which were included in the usual duties of the machine hand position. The resulting work assignments ended up being just "make work." (Plaintiff's Dep. at 142–43). The plaintiff performed certain aspects of the machine hand position but he was not doing all the tasks of a machine hand. (Plaintiff's Dep. at 142). He was performing less than 50–60 percent of what the machine hand position normally entailed. (Plaintiff's Dep. at 143).

On January 18, 1993, Dr. Larson wrote a letter stating that the plaintiff "may not return to work which requires bending or which requires him to lift weights greater than 30 pounds. This lifting should only be done occasionally." (Plaintiff's Admission 61 and Exh. F). The plaintiff told Stevenson that Dr. Larson's January 18, 1993, letter meant the plaintiff could do no bending in connection with his work. (Plaintiff's Admission 62).

On February 5, 1993, Szydel informed Milwaukee Forge's president, Jack Miller, that the company would run out of "make-work" for the plaintiff at noon that day. The plaintiff was called into a meeting with Miller, Szydel, Stevenson and the plaintiff's union steward, Roger Seager. Defendant's management personnel informed the plaintiff that the company had no more "make-work" for him, and that, based upon the IME report from Dr. Stewart, the plaintiff should be able to perform the duties of the machine hand position. The plaintiff was told he had one week to decide whether he would work in that position. He cleaned out his locker the same day.

Thereafter, the plaintiff spoke with Dr. Larson about the possibility of returning to work at Milwaukee Forge in the machine hand position. Dr. Larson told the plaintiff that the decision about whether or not to take the machine hand position "would be pretty much [plaintiff's] judgment call." (Plaintiff's Dep at 169–170).

On February 12, 1993, after discussing the matter with both his treating doctor and his attorney, the plaintiff returned to Milwaukee Forge to give his answer. The plaintiff met with Stevenson, Seager and his father, Gordon Dey, at Milwaukee Forge and told them that he would work within his doctor's restrictions as outlined in Dr. Larson's January 18, 1993, letter. (Plaintiff's Dep. at 151–52). Stevenson then told the plaintiff that the company had no work within those restrictions. The plaintiff was informed that there were no sedentary positions available. (Plaintiff's Admission 75).

As of February 12, 1993, the plaintiff knew that he could not perform the duties of the die polisher position or the duties of the unmodified machine hand position. (Plaintiff's Dep. at 126, 147–148). As of February 12, 1993, the plaintiff was not aware of any other available work at Milwaukee Forge that he could perform. As of at least February 5, 1993, the plaintiff was not aware of anything that would enable him to perform the essential functions of the machine hand position, nor, to his knowledge, was the defendant aware of any such aids. (Plaintiff's Dep. at 147–148).

During the time period from December 21, 1992, to February 12, 1993, the plaintiff did suggest that he should be considered for a foreman position in the die storage shop if one became available. The die storage foreman position was not available at any time from December 1992, through February 1993. The plaintiff had never held a supervisory position at Milwaukee Forge. (Plaintiff's Admission 50). The foreman position would have been a promotion for the plaintiff.

During the time period from December 21, 1992, to February 12, 1993, the plaintiff also suggested that he could fill the timekeeper position when one of the incumbents retired. The timekeeper position was not vacant during this time. (Plaintiff's Admission 55). As of February, 1993, the defendant had no information about when the people holding the two timekeeper positions would retire.

As one possible accommodation, the plaintiff also thought the company should have placed him in a clerical or office position, such as a payroll or receptionist job, but he did not know whether such a position was

open at the time. He did not make this suggestion because "it was not [his] place to make suggestions." (Plaintiff's Dep. at 133–34). No such position was available in February of 1993.

### Analysis

The ADA provides multiple protections to individuals with disabilities and one of the act's express goals is that it 'provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities'. *Coghlan v. H.J. Heinz Co.*, 851 F.Supp. 808, 811 (N.D.Tex.1994); 42 U.S.C. § 12101(b)(1). Title I of ADA prohibits covered entities from discriminating against "a qualified individual with a disability because of the disability ... in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment" 42 U.S.C. § 12112(a). The term "disability" is defined, with respect to an individual, as:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B) a record of such impairment; or
>
> (C) being regarded as having such 'an impairment.

42 U.S.C. § 12102(2).

Congress enacted the ADA to "level the playing field" for disabled people. *Siefken v. Village of Arlington Heights*, 65 F.3d 664, 666 (7th Cir.1995). However, the ADA does not erect an impenetrable barrier around the disabled employee preventing the employer from taking any employment actions vis-a-vis the employee. *Siefken*, 65 F.3d at 666. Regardless of whether the employee has a disability under the ADA, the employer may fire the employee because he failed to perform the job adequately. *See Hedberg v. Indiana Bell Telephone Co, Inc.*, 47 F.3d 928, 934 (7th Cir.1995).

In the parlance of the ADA, a person who does not perform the job adequately is not a qualified individual. *Id.* (citing 42 U.S.C. § 12111[8].) The ADA only protects "an individual with a disability who, with or without an accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Gile v. United Airlines, Inc.*, 95 F.3d 492, 496 (7th Cir.1996) (quoting 42 U.S.C. § 12111[9] ). If the disability affects the employee's work ability, the employer must consider if a reasonable accommodation can be made. *Hedberg*, 47 F.3d at 934 (citing *Vande Zande v. Wisconsin Dept. of Admin.*, 44 F.3d 538 [7th Cir.1995] ). However, as stated by the court, "the ADA is not a job insurance policy, but rather a congressional scheme for correcting illegitimate inequities the disabled face." *Hedberg*, 47 F.3d at 934.

An employer makes accommodations by "making changes in its ordinary work rules, facilities, terms, and conditions in order to enable a disabled individual to work." *Vande Zande v. Wisconsin Dept. of Admin.*, 44 F.3d 538, 542 (7th Cir.1995). The ADA requires an employer to make whatever accommodations are reasonably possible in circumstances so as to allow the employee to perform the functions essential to his position. *Miranda v. Wisconsin Power & Light Co.*, 91 F.3d 1011, 1016 (7th Cir.1996). However, the ADA does not obligate an employer to provide a disabled employee every accommodation on his wish list. *See Schmidt v. Methodist Hosp. of Indiana, Inc.*, 89 F.3d 342, 344–45 (7th Cir.1996); *Stewart v. County of Brown*, 86 F.3d 107, 111–12 (7th Cir. 1996).

The ADA may require an employer to reassign a disabled employee to a different position as a reasonable accommodation where the employee can no longer perform the essential functions of their current position. *Gile*, 95 F.3d at 498–99. However, as explained in *Gile*, there are "significant limitations" on an employer's potential obligation to reassign a disabled employee as a reasonable accommodation. An employer is not obligated to provide an employee the accommodation he requests or prefers; the employer need only provide some reasonable accommodation. *Id.* Nor is an employer obligated to "bump" other employees to create a vacancy for the disabled employee or to create a "new" position for the disabled employee. *Id.* Fur-

thermore, in order for an employer to be obligated to accommodate an employee by reassigning them to a different position, that accommodation must not impose an "undue hardship" on the employer. *Id.*

The defendant argues that it is entitled to summary judgment because the plaintiff cannot establish that he is disabled within the meaning of the ADA and, alternatively, he is not a qualified individual within the meaning of the ADA. With regard to whether the plaintiff is a disabled individual under the ADA, the defendant argues that, although the plaintiff has a physical impairment because his spine is fused and he is unable to bend, he is not disabled because his impairment does not substantially limit one or more of his life's major activities. The defendant asserts that the plaintiff's bending and lifting restrictions do not limit the plaintiff's ability to work. Finally, the defendant argues that no reasonable jury could find that it failed to accommodate the plaintiff.

The plaintiff argues that he is disabled and is a qualified individual within the meaning of the ADA. He asserts that his bending restrictions were temporary and that neither Dr. Larson nor Dr. Stewart, who performed the IME, classified his bending restrictions as "permanent." The plaintiff also contends that the defendant should have provided a stool and should have allowed him to ask fellow machine hand workers for assistance in performing the machine hand position as a reasonable accommodation of his disability. He asserts that with job restructuring and the occasional assistance of other machine hand workers, he could have performed the machine hand job. The plaintiff also argues that, other than offering him the machine hand position, the defendant never explored alternative ways of accommodating his disability and failed to place him in two available positions.

■ To state a cause of action under the ADA, a plaintiff must establish three elements: 1) that he is a disabled person within the meaning of the ADA, 2) that he is otherwise qualified, with or without reasonable accommodation, to perform the essential functions of the job, and 3) that the employer discriminated against him because of his dis-

ability. *Howard v. Navistar Intern.,* 904 F.Supp. 922, 927 (E.D.Wis.1995); *see also, White v. York International Corp.* 45 F.3d 357, 360–61 (10th Cir.1995).

■ The parties dispute whether the plaintiff is disabled within the meaning of the ADA. Accepting for purposes of the pending summary judgment motion that the plaintiff is disabled, the court must then address whether he is a qualified individual with a disability under the ADA and whether he can perform the essential functions of the job. Essential functions are defined as "the fundamental job duties of the employment position." 29 C.F.R. § 1630.2(n). It does not include the marginal functions of the position. *Id.* If the plaintiff is unable to perform the essential functions of the position, the court must then determine whether any reasonable accommodation by the employer would permit him to do the job.

In this case, the plaintiff does not dispute that he was unable to perform his job as die polisher. The position required significant bending and plaintiff's treating doctor stated that the plaintiff "may not return to work which requires bending". (Plaintiff's Admission 61 and Exh. F). The plaintiff was then offered the machine hand position. This position involves the operation of 20 machines and some bending, although considerably less bending than the die polisher's position. The plaintiff indicated that he would be unable to operate machines which comprised approximately 50% of the machine hand position, namely the shaper, floor mount drill press and radial arm drill press, if unaccommodated. Based upon the undisputed description of the standard machine hand position and the plaintiff's treating doctor's assessment, the plaintiff would not have been able to perform the essential elements of the machine hand position without accommodation.

■ Therefore, the court must address whether the plaintiff could perform that job with reasonable accommodation. The definition of reasonable accommodation encompasses modifications or adjustments to the work environment, or the manner or circumstances under which the position held or desired is customarily performed that enable

an individual with a disability to perform the essential functions of that position.[3]  *See* 29 C.F.R. § 1630.2(o)(1)(ii).

Reasonable accommodation may include job structuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, or similar accommodations for individuals with disabilities.  *See* 29 C.F.R. § 1630.2(o)(2)(ii).  However, an accommodation may not impose an undue hardship on an employer.  29 C.F.R. § 1630.2(p).

◼◼◼ The determination of undue hardship with respect to the provision of an accommodation by an employer involves consideration of a number of factors.  *See* 29 C.F.R. § 1630.2(p).  Among those factors is the impact of the accommodation upon the operation of the facility, including the impact on the ability of other employees to perform their duties and the impact on the facility's ability to conduct business.  *See* 29 C.F.R. § 1630.2(p)(2)(v).  An accommodation that would result in other employees having to work harder or longer is not required under the ADA.  *See Milton v. Scrivner, Inc.,* 53 F.3d 1118, 1125 (10th Cir.1995); 29 C.F.R. § 1630.2(p)(2)(v).

The plaintiff argues that, as a reasonable accommodation, the defendant should have provided the use of an adjustable stool which would have eliminated some of the bending involved in the job.  However, he testified that the shaper and drill press would still require some bending.  These machines comprise some 50% of the job.  He also acknowledged that the machine hand position would require some bending, even with accommodations.

Plaintiff further argues in his brief that, as a reasonable accommodation, he should have been permitted to ask for the occasional assistance of other machine hand workers in performing his machine hand job.  The plaintiff makes no mention of the type of assistance or amount of time his fellow workers would spend in assisting him in doing his job.  He also cites no authority for this position.

◼◼◼ The ADA does not require an employer to reallocate job duties in order to change the essential functions of a job.  *Milton,* 53 F.3d at 1124; *see also,* 29 C.F.R. § 1630.2(o); *Gilbert v. Frank,* 949 F.2d 637, 644 (2nd Cir.1991) (plaintiff's suggestion that co-workers could assist him with heavy lifting as a reasonable accommodation rejected as eliminating essential function of plaintiff's job; such task reallocation would slow down and reduce the productivity of the operation).  The reallocation of job responsibilities constitutes a change in the essential functions of a job and is not required under the ADA.  *See Otis v. Canadian Valley–Reeves Meat Co.,* 884 F.Supp. 446, 449 (W.D.Okl.1994).  Requiring fellow workers to assist the plaintiff would involve a reallocation of some job duties.  It also would impact on the ability of other employees to perform their duties and on the ability of the defendant to operate its business.  *See* 29 C.F.R. § 1630.2(p)(2)(v).  Such accommodation would impose an undue hardship on the defendant and is not required under the ADA.

◼◼◼ Thus, the evidentiary materials before the court do not demonstrate that the plaintiff is a qualified individual under the ADA.  Accordingly, for the foregoing reasons, the court finds that the plaintiff has failed to establish the essential elements of a claim under the ADA.

◼◼◼ Moreover, even assuming that the plaintiff could establish that he is both under a "disability" and that he is a "qualified individual" under the ADA, this court concurs with the defendant that no reasonable jury could conclude that the defendant failed to reasonably accommodate the plaintiff's limitations.  The undisputed facts establish that following the plaintiff's surgery in October 1991, the defendant allowed the plaintiff to return to work half-time, working four hours per day in a light duty position.  Thereafter, when the plaintiff's treating physician modified his work restrictions, the plaintiff was permitted to return to temporary light duty work at Milwaukee Forge for

---

**3.** The administrative regulations provide "interpretive guidance," which constitutes a body of experience and informed judgment, although not controlling upon the courts.  *See Gile,* 95 F.3d at 497–98.

four hours per day performing a variety of jobs. During this time, the plaintiff was paid the same hourly rate he had earned as a die polisher. The defendant responded to the plaintiff's limitations by allowing him to work half-time, as a reasonable accommodation. *See Hedberg,* 47 F.3d at 934.

In September 1992, the plaintiff stopped working and entered a work hardening program at Curative Rehabilitation Center. On October 24, 1992, the plaintiff's treating doctor, Dr. Larson, informed the plaintiff and the defendant that the plaintiff no longer could perform the duties of the die polisher position.

In a December 15, 1992, report, Dr. Larson stated that the plaintiff could not return to work which required repetitive bending, more than occasional lifting of weights not greater than 30 pounds and which required continued maintenance of even a mildly flexed posture. This December 15, 1992, report gave an indication for the first time of what the plaintiff's permanent restrictions were going to be. On January 18, 1993, Dr. Larson revised plaintiff's restrictions, stating that the plaintiff "may not return to work which requires bending" or which requires lifting of more than 30 pounds.

Although the plaintiff argues that such restrictions were temporary, this court notes that Dr. Larson did not specify that the restrictions were temporary. Rather, Dr. Larsen's report clearly implies that the restrictions were of a permanent nature. This conclusion is further supported by the fact that over a year had elapsed since the plaintiff's surgery. Moreover, the plaintiff's complaint alleges that Dr. Larson's physical work restriction of no bending was a "permanent" limitation. (Plaintiff's Complaint ¶ 6). Under these circumstances, the defendant could reasonably believe that such restrictions were permanent.

After receiving the information from Dr. Larson regarding the plaintiff's restrictions, the defendant attempted to identify the plaintiff's other skills or experience to find a job he could perform within his restrictions. The machine hand position was offered to the plaintiff because he had held previously held that position.

The plaintiff attempted to perform this position. However, on January 5, 1993, the plaintiff complained that his back was bothering him. On January 6, 1993, the plaintiff told Szydel that working on the shaper machine was hurting his back so Szydel assigned the plaintiff to different tasks. He also suggested that the plaintiff identify those tasks he could do, those he could not do, and those which caused him difficulty.

The plaintiff prepared a response, identifying the operations which he could not perform within his restrictions. The plaintiff and Szydel reviewed plaintiff's list together. In so doing, the defendant engaged in the cooperative process with the plaintiff to determine a reasonable accommodation. *See Feliberty v. Kemper Corp.,* 98 F.3d 274, 279–80 (7th Cir.1996).

Thereafter, Szydel limited the plaintiff's job assignments to tasks within his restrictions. Thus, the defendant offered the plaintiff a reasonable accommodation. *See Hedberg,* 47 F.3d at 934. However, the resulting work assignments ended up being just "make work" and on February 5, 1993, Szydel informed Milwaukee Forge's president that the defendant would run out of "make-work" for the plaintiff that day. As a result, the plaintiff was informed that the defendant had no more "make-work" for him, and that, based upon the IME report, he should be able to perform the duties of the machine hand position.

On February 12, 1993, after discussing the matter with both his treating doctor and his attorney, the plaintiff informed the defendant that he would work within the restrictions delineated by his treating doctor. He was told that the defendant had no work within those restrictions, and that there were no sedentary positions available.

It is undisputed that, as of that date, the plaintiff knew he could not perform the duties of the die polisher position or the duties of the standard machine hand position. The plaintiff acknowledges that, while the use of an adjustable stool would have eliminated some of the bending in the shaper and drill press jobs, the modified machine hand position would involve some bending, even

with all accommodations. Requiring fellow workers to assist the plaintiff in performing the machine hand job would impact on the work of other employees and impose an undue hardship on the defendant. *See Milton,* 53 F.3d at 1125; 29 C.F.R. § 1630.2(p)(2)(v). The plaintiff was also not aware of any other available work at Milwaukee Forge that he could perform.

Although during the time period from December 21, 1992, to February 12, 1993, the plaintiff suggested that he should be considered for a foreman position in the die storage shop, such a position was not available at that time. The plaintiff also suggested that he could fill the timekeeper position, but this position was not vacant during this time period. The plaintiff also thought that, as an accommodation, the company should have placed him in a clerical or office position, such as a payroll or receptionist job, but no such position was available in February of 1993.

■ As previously stated, employers are not obligated under the ADA to provide a disabled employee every accommodation on his wish list. *See Schmidt,* 89 F.3d at 344–45; *Stewart,* 86 F.3d at 111–12. The plaintiff's suggestions regarding positions that should have been offered to him between December 21, 1992, and February 12, 1993, exceed the "significant limitations" on an employer's potential obligation to reassign a disabled employee as a reasonable accommodation, since the suggested positions were not currently available. *See Gile,* 95 F.3d at 498–99.

■ The plaintiff also asserts that he should have been placed in two available positions, the jobs of a shipping clerk or maintenance assistance. However, even if these positions were vacant, there is no evidence before the court indicating that the plaintiff could do either job. Furthermore, to the extent that the plaintiff believes that the defendant was obligated to create a permanent job for him, that belief is erroneous. *See Gile,* 95 F.3d at 498–99; *see also, Fedro v. Reno,* 21 F.3d 1391, 1396 (7th Cir.1994). Additionally, the fact that an employer may have created a new position for some other disabled employee does not create an obli-

gation for the employer to provide the same accommodation in all subsequent instances. *Vande Zande,* 44 F.3d at 545; *Myers v. Hose,* 50 F.3d 278, 284 (4th Cir.1995).

■ Under the circumstances of this case, based on the undisputed facts, no reasonable jury could find that the defendant failed to provide the plaintiff with a reasonable accommodation. The defendant made accommodations by making changes in its ordinary work rules, facilities, terms, and conditions in an attempt to enable the plaintiff to work. *See Vande Zande,* 44 F.3d at 542. The defendant fulfilled its obligations to accommodate the plaintiff as delineated in *Gile.* Based on the foregoing, there is no evidence upon which a reasonable jury could find that the defendant failed to provide the plaintiff with a reasonable accommodation.

In sum, this court concludes that, based upon the submissions, the plaintiff has failed to establish the essential elements of an ADA claim. Furthermore, no reasonable jury could conclude that the defendant failed to provide reasonable accommodations to the plaintiff. Accordingly, based on the undisputed facts, the defendant has established that it is entitled to summary judgment.

### ORDER

**NOW THEREFORE, IT IS ORDERED** that the defendant's motion for summary judgment be and hereby is **GRANTED.**

**IT IS FURTHER ORDERED** that the Clerk of Court is **DIRECTED** to enter judgment accordingly.

