**Albert ZIEBA Plaintiff,**

v.

**SHOWBOAT MARINA CASINO PARTNERSHIP Defendant.**

**No. 2:03 CV 116 PPS.**

United States District Court,
N.D. Indiana,
Hammond Division.

Jan. 14, 2005.

Terry R. Boesch, Boesch & Istrabadi PC, Valparaiso, IN, Anna Marie Hearn, F. Amin Istrabadi, Blachly Tabor Bozik & Hartman, Kristin Scheuerman, Millbranth & Bush Law Office, Donald R. VanDerMoere II, Boesch & Istrabadi PC, Valparaiso, IN, for Plaintiff.

Rachel F. Bradley, Barnes & Thornburg LLP, South Bend, IN, Patrick H. Hicks PHV, Littler Mendelson PC, Las Vegas, NV, Stefanie W. Kohen, Littler Mendelson PC, Chicago, IL, Jody H. Odell, Barnes & Thornburg LLP, South Bend, IN, Garrison L. Phillips, Amy M. Toepper, Dorothy Larkin Young, Littler Mendelson PC, Chicago, IL, for Defendant.

### ORDER

SIMON, District Judge.

Before the Court is Defendant Showboat Marina Casino Partnership's Motion for Summary Judgment. Because there are

material issues of fact as to whether or not Plaintiff Albert Zieba's requested accommodations are reasonable, that motion is denied.

## I. BACKGROUND

Showboat operates Harrah's East Chicago Casino (hereinafter, the Defendant will be referred to as "Harrah's"), a gaming establishment located in East Chicago, Indiana. Harrah's hired Zieba on July 30, 1998, as an on-call bartender. Harrah's changed Zieba's status to full-time bartender at some point thereafter. The shifts for full-time bartenders are normally approximately eight to ten hours long.

On August 5, 2001, Zieba was struck by a car while crossing the street and very severely injured. He was in a coma for weeks and underwent months of rehabilitation. As a result of his injuries, Zieba had to take FMLA leave from August 6, 2001, until approximately November 10, 2001. On November 6, 2001, Plaintiff's physician, Dr. Richard Senno, wrote a letter to Harrah's in which he advised that "[a]t this time, the prospect of [Zieba's] return to work is indefinite pending his continued progress in his rehabilitation process." That note gives the impression that Zieba's prognosis was not good. It mentions that "it is expected that his cognitive deficits will remain for at least one year … from the date of his accident," and that he "requires extra time for all physical mobility." (Zieba Dep. Exh. 13).

Because of his continued inability to work, Harrah's granted Zieba a personal leave of absence, to expire on February 15, 2002. Before that expired, on January 18, 2002, Harrah's requested an update on Zieba's status and informed him that his personal leave was about to end. Zieba responded by having his rehabilitation therapist send a letter dated February 20, 2002, after the date his personal leave of absence expired.[1] That letter indicated a significant amount of progress since Zieba's doctor wrote the letter the previous November. It gave suggestions for a "safe and successful return to work." (Zieba Dep. Exh. 15). They suggested he start out working "2–3 part days per week (start with 3 hours a day), as tolerated, Albert can increase to full days." (Zieba Dep. Exh. 15). They also suggested he take ten to fifteen minute rest breaks as needed throughout the day, that seating be available if needed, and it encouraged him to use proper body mechanics when lifting.

Harrah's felt that these restrictions would cause them undue hardship, and thus that they could not reasonably accommodate Zieba's restrictions. As he had exhausted every type of leave of absence available to him, his employment was terminated effective March 12, 2002. In the letter notifying him of his termination, they also informed him that if he later became able to perform the essential functions of his job, or if his request for accommodation could be fulfilled without undue hardship, Harrah's would consider him for rehire.

Zieba filed a charge of discrimination with the EEOC on September 10, 2002, alleging disability discrimination, wrongful termination, and retaliation. He filed his Complaint in this action alleging that Harrah's violated the Americans with Disabilities Act, that they retaliated against him, that they violated the FMLA, that they wrongfully and/or constructively discharged him, and that they intentionally inflicted emotional harm upon him. In his Response to Harrah's Motion for Summary Judgment, he conceded that he has

---

1. Apparently, Zieba also had his physician send a note, but that is not in the record before us.

no claim of retaliation, violation of the FMLA, intentional infliction of emotional distress, or wrongful discharge under Indiana law. Thus, Harrah's motion for Summary Judgment on these issues is granted, and the only remaining claims are those related to the ADA.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is proper where the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Williams v. Waste Mgmt. of Illinois*, 361 F.3d 1021, 1028 (7th Cir.2004). The Court construes all facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir.2002).

### B. ADA Claims

▇▇▇ Generally, the unlawful discrimination against an otherwise qualified employee includes both discriminatory discharge and failure to make a reasonable accommodation. *Bombard v. Fort Wayne Newspapers*, 92 F.3d 560, 563 (7th Cir. 1996). Zieba concedes in his response brief that this is a failure to accommodate case. (Plaintiff's Brief in Opposition at p. 14). In a reasonable accommodation case, "the plaintiff must first show that: 1) he was disabled; 2) his employer was aware of his disability; and 3) he was a qualified individual who, with or without reasonable accommodation, could perform the essential functions of the employment position." *Basith v. Cook County*, 241 F.3d 919, 927 (7th Cir.2001). If Zieba can establish that, he must then show that Harrah's failed to

reasonably accommodate his disability. *Id.* Zieba then survives summary judgment unless Harrah's can demonstrate "that the accommodation would impose an undue hardship on the operation" of their business. 42 U.S.C. § 12112(b)(5)(A).

### 1. Zieba's Status as a Qualified Individual With a Disability

▇▇▇ Harrah's essentially concedes that Zieba is disabled and that they knew of his disability, and Zieba does not appear to dispute that he could not perform his work as a bartender without reasonable accommodations. Thus, the main dispute in this case is whether or not Zieba was a qualified individual with a disability who could perform the essential functions of being a bartender with reasonable accommodations. Whether someone meets the definition of a "qualified individual with a disability" involves a two-step determination. 29 C.F.R. app. § 1630.2(m). First, we consider whether "the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." *Id.* If he does, then we must consider "whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation." *Id.* The determination as to whether an individual is a "qualified individual with a disability" must be made as of the time of the employment decision. *Id.* The plaintiff bears the burden of proof on this issue; he must be able to show that he is a "qualified individual with a disability" in order to successfully prosecute an ADA claim. *See DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 797 (7th Cir.1995).

▇▇▇ There is no question in this case that Zieba meets the first part of this test: he possessed "the appropriate educational background, employment experience,

skills, licenses, etc." The real issue revolves around whether or not he could perform the essential functions of his position, full-time bartender, with a reasonable accommodation. Harrah's argues that working eight hour shifts is an essential function of being a full-time bartender, and that Zieba was limited to four hour shifts with occasional breaks at the time of his termination. Zieba testified to the existence of "breaker shifts." His testimony indicated that during each shift, bartenders were assigned to the various bars throughout the boat, and one was assigned the breaker shift. The person working the breaker shift rotated around and gave other bartenders breaks throughout the day. This evidence demonstrates that the occasional short breaks that Zieba's medical release indicated he might need could reasonably be accommodated by the existing staff and break system in place, or at least it raises a genuine issue of material fact in this regard.

The breaker shift also partially mitigates Harrah's concern about Zieba's therapists' recommendation that he initially not work a full eight hour shift. If Zieba could not finish a full eight hour shift, the breaker shift might be able to finish it for him. More importantly, the evidence suggests that all of the accommodations that Zieba sought would be temporary, and that he would work his way up to a full shift. The impression he gave in his deposition was that he believed that his initial short shifts would allow him to build up his endurance and he would gradually move to a full shift. Harrah's cites cases for the proposition that it would be unreasonable for an employer to have to hire an extra employee to be on call to finish the disabled employee's duties if he was unable to do them himself. But the present situation is different from the circumstances in the cases cited by Harrah's. For example, Zieba would not be ending his shift unpredictably and at his discretion, unlike in

*Amadio v. Ford Motor Co.*, 238 F.3d 919, 928 (7th Cir.2001) ("the only imaginable accommodation is an open-ended schedule that allows the employee to come and go as he pleases..."). Rather, he just needed to start out with shorter days to build up his stamina. A person would not have to be standing by to replace him the rest of the day, someone would just have to take over for him after his short shift was over. And again, this situation was only temporary, unlike in most of the cases cited by Harrah's. *See, e.g., Dey v. Milwaukee Forge*, 957 F.Supp. 1043, 1053 (E.D.Wis.1996) ("Dr. Larsen's report clearly implies that the restrictions were of a permanent nature"); *Amadio*, 238 F.3d at 928.

In addition, in many of the Seventh Circuit cases cited by Harrah's, the defendants attempted various arrangements to accommodate the plaintiff's limitations before they came to an impasse. *Dey*, 957 F.Supp. at 1053 ("The undisputed facts establish that following the plaintiff's surgery in October 1991, the defendant allowed the plaintiff to return to work half-time, working four hours per day in a light duty position"); *Basith v. Cook County*, 241 F.3d 919 (7th Cir.2001) (where the defendant offered the defendant an alternative position and had other employees perform some of his duties before concluding that the situation was untenable). Here, no such attempt was made other than what appears to be a cursory search for alternatives done without consulting Zieba. A jury could reasonably find that Zieba's request for short shifts when he first started work were a reasonable accommodation that would render him capable of performing the essential functions of his job.

In the same vein, Zieba conceded that he might need a stool behind the bar in order to perform the essential functions of

his job, a not unreasonable request given that he testified that the bars were generally no larger than an office desk. Although the job requirement sheet provided by Harrah's lists the ability to stand and walk for eight or ten hour shifts as a qualification, Mike Serratore, Harrah's Senior Employee Relations Consultant, stated that the job only required standing twenty percent of the time and walking twenty percent of the time, so a jury could conclude that there were opportunities to use the stool without interrupting customer service. (Serratore Decl. at par. 11). Zieba testified that he did not intend to use the stool throughout the day, just to give his legs a break when the bar was not busy. This sort of simple accommodation is exactly the type of thing that the ADA was intended to encourage, 42 U.S.C.A. § 12111(9) (defining reasonable accommodation as, among other things, "acquisition or modification of equipment or devices"), so it is difficult to see providing a stool as an unreasonable accommodation.

Harrah's also points out that Zieba admitted that he had difficulty concentrating for more than ten or fifteen minutes. But Zieba made that statement in the context of whether or not he could concentrate for the purposes of reading or taking college classes. A jury could rationally conclude that the concentration necessary for bartending is of a different sort altogether. Further, the list of qualifications for the bartending position that Harrah's provided does not include any activities that require much concentration. The only mental activities mentioned are the ability to add and subtract. The Court has little difficulty in concluding that there is a material issue of fact as to whether long bouts of concentration are necessary in a bartender. Thus, Zieba has presented enough evidence to get to a jury on the issue of being a qualified individual with a disability.

### 2. Zieba's Sworn Statements Regarding His Application for Social Security Benefits

One hiccup in Zieba's being a qualified individual with a disability is the sworn statements Zieba made in order to apply for his Social Security Disability Insurance ("SSDI") benefits. On October 15, 2001, Zieba stated, "I became unable to work because of my disabling condition on August 5, 2001. I am still disabled." (Def.'s Exh. 4). On the basis of these statements, among other things, Zieba was awarded SSDI benefits, and he has continued to receive disability benefits since then. In some cases, statements like these can prevent a plaintiff from later claiming that he is a qualified individual with a disability. *Feldman v. American Mem'l Life Ins. Co.*, 196 F.3d 783, 790–92 (7th Cir.1999). But since the Supreme Court ruled in *Cleveland v. Policy Management Systems Corp.*, it has been clear that merely applying for SSDI does not estop a claim under the ADA. 526 U.S. 795, 804, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999). The *Cleveland* Court noted that "there are too many situations in which an SSDI claim and an ADA claim can comfortably exist side by side." *Id.* at 802–03, 119 S.Ct. 1597. But the plaintiff cannot ignore apparent inconsistencies and must explain the seeming contradiction. *Id.* at 806, 119 S.Ct. 1597. For instance, the Court pointed out that an SSDI claim does not consider whether the claimant can work with reasonable accommodation, which is considered under the ADA. *Id.* at 803, 119 S.Ct. 1597. In addition, as the Seventh Circuit has stated, "the severity of a disability may change over time such that an individual was totally disabled when she applied for SSDI, then later was a qualified individual at the time of the employment decision disputed in an ADA suit." *Feldman v. American Memorial Life Ins. Co.*, 196 F.3d 783, 790 (7th Cir.1999).

In this case, Zieba applied for SSDI benefits on October 15, 2001, only nine days after being released from the rehabilitation facility. At the time, he was still in a wheelchair and had not been released to work by his doctor. Among other things, he was still recovering from fractures to his skull, spine, pelvis, leg, foot and ribs. After months of rehabilitation, his situation improved and his therapist advised him that he could go back to work with accommodations. Thus, Zieba has proffered two sufficient explanations for the apparent contradiction between his ADA claim and his statements regarding his SSDI application. First, the severity of his disability changed over time, such that he could have been totally disabled when he applied for SSDI, then became a qualified individual at the time of the employment decision in question. Second, because SSDI does not consider the ability to work with accommodation and the ADA does, it is not necessarily inconsistent that he would be able to bartend with some accommodation and still be considered totally disabled for SSDI purposes.

### 3. Harrah's Reasonable Accommodations

■ We turn now to whether or not Harrah's offered Zieba reasonable accommodations, as required under the ADA. *See, e.g., Beck v. University of Wisconsin Bd. of Regents,* 75 F.3d 1130, 1135 (7th Cir.1996). Zieba has raised a material issue of fact in this regard. As discussed in the preceding paragraphs, a rational jury could find that Zieba's requests were reasonable. Harrah's response to these reasonable requests was to reject his suggested accommodations and to terminate him and invite him to reapply when his condition would no longer impose an undue hardship on the company. While the ADA does have a safe harbor that allows employers to refuse to provide accommodation if it would cause "undue hardship," 42

U.S.C. § 12112(b)(5)(A), there is at least a material issue of fact in this case as to whether this was an undue hardship for Harrah's.

Viewing the facts in the light most favorable to Zieba, it is difficult to see how the accommodations his doctors recommended would have been all that burdensome to the company. The most onerous part of his requested accommodations—shorter shifts and occasional breaks—do not seem very burdensome. There is, to be sure, a question of fact whether the requested accommodation would have presented an undue hardship to Harrah's. There is evidence that there was already a procedure in place, the breaker shift, that could handle the occasional break that Zieba might require. And his testimony and the documentary evidence suggest that the limited hours he needed would be temporary. Zieba has come forth with enough evidence that a jury could rationally conclude that his requested accommodations would not be an undue hardship.

■ Further, a jury could also conclude that Harrah's intransigence in accommodating Zieba may have prevented a reasonable accommodation from being settled upon between the parties. The Seventh Circuit has made clear that "[a]n employee's request for reasonable accommodation requires a great deal of communication between the employee and employer." *Bultemeyer v. Fort Wayne Community Schools,* 100 F.3d 1281, 1285 (7th Cir.1996). "[T]he employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." 29 C.F.R. § 1630.9; *Bultemeyer,* 100 F.3d at 1285–86. While the breakdown in the interactive process itself is not enough for

employer liability, a plaintiff can prevail if he can show that this breakdown led to the employer's failure to provide a reasonable accommodation. Although the C.F.R. does not have any hard and fast rules for assigning responsibility for the breakdown of the interactive process, it is clear in this case that there is at least enough evidence for Zieba to proceed to the jury on the issue of whether or not Harrah's caused this process to fail.

The evidence before the Court is that shortly after Zieba told Harrah's of his limitations, they terminated him. Harrah's asserts that they attempted to find him other jobs that would accommodate his situation, but this search does not appear to have been very thorough or to have included input from Zieba. Further, Zieba's attempts to contact the company and find a solution were met with little response. After receiving their termination letter, Zieba e-mailed the company and made clear that the limitations placed on him by his doctor were temporary. He even speculated about the timetable for his return, "to be clear I start let's say Monday at 3 hrs. Tuesday (if I can) be at 4 hours wed I work 5 hours, all this is hyopthetical until i work the 3 hours to start." (Zieba's March 13, 2002, e-mail.)

Harrah's now complains that statements like these are vague assertions of Zieba's own opinion of his abilities, and inadmissible for showing what he was actually capable of doing. That may well be, but as discussed above, if Harrah's would have liked something from Zieba's doctor indicating a more precise timetable, they could have easily asked him for such information at the time. The regulations contemplate this sort of communication between the employer and employee. This sort of flexible back and forth is often necessary to craft a solution that allows a disabled employee to return to work without unduly burdening the employer. Zieba got the ball rolling in the process when he responded to Harrah's concerns about shift length by proposing some possible solutions. Instead, Harrah's reacted to his suggestions by sending him a letter reiterating his termination and asking him to reapply when he could perform the essential functions of the job without unduly burdening them. Zieba testified that he stopped trying to make any more efforts to get back to work because of these letters he received from Harrah's. (Zieba Dep. at 168). Notably, no one from Harrah's called or made any attempt to talk to him or his doctor about his limitations. (Zieba Dep. at pp. 167, 169). A jury could rationally find from the evidence that the entire process was lacking in the sort of interactivity that the C.F.R. contemplates, and that would allow Harrah's to find out what they could reasonably do to accommodate Zieba.

In sum, there are a number of material questions of fact in this case, including but not limited to the following:

1. Could Zieba perform the essential functions of a bartender with a stool and a modified work schedule?

2. Was Zieba's request for a modified schedule temporary?

3. Did Zieba have the mental capacity to bartend?

4. Was there a breaker shift?

5. Were Zieba's requested accommodations reasonable?

6. Would providing a modified work schedule pose an undue hardship on Harrah's?

7. Was Harrah's offer to allow Zieba to reapply for the job later a reasonable accommodation?

8. Who was responsible for the breakdown of the interactive process used to determine an appropriate accommodation?

### III. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [Docket No. 48] is **GRANTED IN PART AND DENIED IN PART**. Summary Judgment is granted with respect to his claims of retaliation, violation of the FMLA, intentional infliction of emotional distress, and wrongful discharge under Indiana law, but it is denied with respect to his ADA claim.

**SO ORDERED.**